**ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs,**

v.

**CORPS OF ENGINEERS OF the UNITED STATES ARMY et al., Defendants.**

No. LR-70-C-203.

United States District Court,
E. D. Arkansas, W. D.

May 5, 1972.

Richard S. Arnold, Texarkana, Ark., Edward Lee Rogers, Stony Brook, N. Y., Wellborn Jack, Jr., Shreveport, La., for plaintiffs.

W. H. Dillahunty, U. S. Atty., Little Rock, Ark., Stuart Schoenburg, Land and Natural Resources Division, Department of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION NUMBER SIX

EISELE, District Judge.

 On January 13, 1972, the defendants filed with the Court the new environmental impact statement and simultaneously filed a motion for summary judgment in which they have asked the Court to dissolve and set aside the injunction.[1] The plaintiffs thereupon

---

1. The new environmental impact statement (EIS) starts with the following resume:

"This statement represents the Corps' effort to comply with the Court's Final Order. Commensurate with the Court's opinion to the effect that the National Environmental Policy Act of 1969 is an environmental full disclosure law, all comments by persons, organizations, and government agencies, regarding the environmental impact statement, have been included and responded to in the statement.

"We have either reassessed or reaffirmed earlier decisions. A significant reassessment was our decision to modify the existing outlet works to include a higher level low-flow intake to gain additional flexibility in selective water quality discharges.

"A full range of alternatives to the completion of the project as designed has been considered and environmental impacts of each alternative have been evaluated. The principal thrust of the statement is an interdisciplinary assessment of the environmental impacts of the project and the alternatives on the total environment."

The main body of the statement, consisting of approximately 200 pages, is broken down into a summary and eight "paragraphs". The first paragraph contains a description of the project as originally approved. The remaining seven paragraphs, as indicated by their re-

filed a comprehensive brief in opposition to the defendants' motion, contending, among other things, that there were genuine issues of fact yet to be disposed of.[2] Plaintiffs first contended that defendants' new EIS was "not impartial

spective titles, contain a statement of: "Environmental Setting Without the Project", "Environmental Impacts of the Proposed Action", "Adverse Environmental Effects Which Cannot Be Avoided Should the Proposal Be Implemented", "Alternatives to the Proposed Actions", "Relationship Between Short Term Uses of Man's Environment and the Maintenance and Enhancement of Long Term Productivity", "Irreversible or Irretrievable Commitment of Resources Which Would Be Involved in the Proposed Action Should It Be Implemented", and "Coordination With Others".

There are six appendices to the statement, consisting of approximately 1,150 pages. Appendix I contains copies of all correspondence between the Corps and concerned public and private agencies and individuals and the transcripts of public meetings held at Fort Smith, Arkansas, on August 31, 1971, and in DeQueen, Arkansas, on September 8, 1971. Appendix II contains copies of photographs taken of the project area. Appendix III contains statements with respect to the following "Environmental Elements": Archeology; Geology; Botany; Zoology; Economic Conditions, Social Relationships, and Human Well-being; and Hydrology and Water Quality. Appendix IV contains a bibliography of all literature cited in the statement. Appendix V contains a copy of the transcripts of this Court's proceedings held on November 24, 1970, and February 8, 9 and 10, 1971, including a copy of the pleadings filed in the case. Appendix VI sets forth the qualifications of the "Interdisciplinary Personnel" utilized by the Corps in connection with the statement.

A large portion of the EIS concerns the Corps' coordination with other agencies and individuals. This coordination began on July 2, 1971, with a letter to all known interested agencies, groups and individuals. That letter, which enclosed the format and portions of the preliminary draft of the new EIS, requested that the recipients furnish any environmental data which they thought should be used in the preparation of the statement. This letter was followed by letters on July 16 and July 30 enclosing additional or revised sections of the preliminary draft. And, on August 6, additional material was forwarded completing the draft EIS. The inputs received from these letters were summarized and responded to in the main body of the impact statement. The federal agencies which responded to this letter were: The National Oceanic and Atmospheric Administration; The Environmental Protection Agency; The Department of Health, Education and Welfare; The Department of Transportation; The National Park Service; The Bureau of Outdoor Recreation; The Soil Conservation Service; The Forest Service; The Department of State; The Federal Power Commission; and The Bureau of Sport Fisheries and Wildlife. The State of Arkansas agencies which responded were: The Soil and Water Conservation Commission, The Department of Health, The Department of Pollution Control and Ecology, and The Department of Planning. In addition, several private environmental societies and groups were contacted. Among them were: The Arkansas Environmental Research Society, The Arkansas Ecology Center, The Ozark Society, The National Water Resources Committee—Sierra Club, The Sierra Club—Tulsa Group and The Environmental Defense Fund. Also, many individuals, including the attorney for the plaintiffs and the individually-named plaintiffs, were contacted and did respond.

The final phase of coordination occurred in connection with the review of the August 6, 1971, draft of the statement. This coordination was conducted with many of the federal and state agencies and private groups listed above. Their comments and suggestions were also included in the final draft of the EIS.

Finally, the Corps conducted public hearings at Fort Smith, Arkansas, on August 31, 1971, and in DeQueen, Arkansas, on September 8, 1971. These meetings drew a large attendance, approximately 261 people, and their comments were categorized and responded to in the final statement. In addition, a transcript of those proceedings was included as an appendix to the statement.

2. Although the Court agreed with the plaintiffs that certain limited factual issues remained, most of the arguments and contentions of the plaintiffs turn upon issues of law which can be disposed of by summary judgment. Because of severe restrictions upon the Court's time and because the Court is not required to file an opinion with respect to the disposition of legal issues upon summary judgment,

and objective". Court and counsel engaged in correspondence in an effort to define the type and degree of "objectivity" that was required by the NEPA. The Court concluded that, "at a minimum, the involved federal agency must make a good faith effort to comply with the provisions of NEPA". It further concluded that the NEPA does not permit impact statements to be "consciously slanted or biased" since a "contrary view would negate the requirement of good faith". The Court specifically emphasized the word "consciously" which, it stated, carried with it "the inference of intentional misrepresentation".

After the above correspondence, the plaintiffs advised the Court that they would like the opportunity to prove that the impact statement was "consciously slanted or biased" and to show "actual bad faith or improper behavior" on the part of the defendants. A hearing for this purpose, and, indeed, to provide plaintiffs with an opportunity to present evidence upon *any* genuine issue of material fact which they believed remained in the case, commenced at 9:30 a. m. on April 27, 1972, and was concluded on the afternoon of April 28, 1972. At the conclusion of the hearing, the Court found from the bench that the defendants prepared the new impact statement in good faith and that said defendants had made a good faith effort to comply with the provisions of the NEPA. The Court further found that the new EIS was not consciously slanted or biased and that the defendants had not consciously or intentionally made any misrepresentations in the new EIS or consciously or intentionally withheld any pertinent information required by the NEPA. The Court also found that the defendants had attempted to make a full disclosure of the pertinent facts and opinions, both favorable and unfavorable, in the new EIS. The Court concluded that the new EIS met the "objectivity" requirements of the NEPA.

The plaintiffs also contend that the EIS arbitrarily and capriciously misstates the facts with respect to the effect of the dam upon the sport and recreation of canoeing. An expert canoeist, Mr. David Gail Cowart, testified that the most desirable canoeing conditions are those described in the new EIS as "intermediate". He further testified that these optimum flow conditions would be adversely affected by the construction of the dam. By personally observing the Cossatot River he made the judgment that the best canoeing conditions would result when the flow was between 200 cubic feet per second and 400 cubic feet per second. Starting with this judgment he then analyzed the hydrographs to determine the frequency of such conditions, first, assuming the dam in place and, secondly, assuming that the Cossatot remained a free-flowing river. The plaintiffs also urge, in this connection, that the basic hydrological information which now makes possible Mr. Cowart's testimony was not released by the defendants until the close of the period for comment on the new EIS.

Although one may fault the defendants for concluding that there was a much broader spectrum of flows which would support good canoeing and good floating (without first getting the advice and opinion of an expert canoeist), the Court cannot find from the evidence, or conclude as a matter of law, that the defendants have arbitrarily and capriciously misstated the facts. Certainly there was no deliberate or intentional misrepresentation on the part of the defendants.

Plaintiffs assert that the most serious deficiencies in the new EIS are evident in the defendants' discussion and development of the alternative of preserving the Cossatot as a "scenic river" under the National Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271 et seq. The EIS does state that "the Cossatot . . . appears to have merit for consideration

this memorandum will not take up and discuss all of the issues of law raised by the plaintiffs. It will deal primarily with

the factual issues remaining in the case and those issues of law which relate to such factual issues.

as a scenic river" (p. 3–38) and that "the Cossatot appears to have merit within the qualifications outlined for a scenic river designation because the river is indeed replete with scenic amenities" (p. 5–25). But plaintiffs argue that the statement appearing at page 5–24 that "the State of Arkansas has not designated, recommended, or asked for any action on the Cossatot pursuant to the Wild and Scenic Rivers Act" is not true. Evidence intended to support this charge was received at the most recent hearing. That evidence reveals that Mr. Troyt York, the Director of the Department of Planning for the State of Arkansas, wrote to Mr. Roy Wood, Regional Director, United States Department of Interior, Bureau of Outdoor Recreation, on June 16, 1971, recommending the Cossatot River for consideration "because it is the most unique white-water recreational stream in the Ouachita and southwest Arkansas area, and because it is the only remaining high quality stream of this type in the southern part of the state having possibilities of preservation". It is clear that the existence of this letter was known to the defendants as early as August 31, 1971, on which date a representative of the plaintiffs so apprised the defendants in an oral statement read at a public hearing held by the defendants at Fort Smith, Arkansas. The problem, however, arises from the difficulty which the defendants had in obtaining *directly* from the State of Arkansas, or its appropriate agencies, a clear indication of the actual position of the state. Resolutions passed by the Arkansas General Assembly appeared to indicate that the state's position is that the dam should be constructed. On October 4, 1971, Colonel Morris wrote to Mr. York as follows:

"Information presented at the public meetings, held to secure information for the Gillham Lake environmental impact statement, indicates that your agency made some type of request to the Southeast Regional Office of the Bureau of Outdoor Recreation concerning the Cossatot as a Wild and/or Scenic River.

"Since we did not receive a copy of such a request in your correspondence or from BOR we assume you inadvertently overlooked furnishing it for inclusion in the environmental impact statement.

"Could we please have a copy of the request so it may be included."

On October 27, 1971, Mr. Harold E. Alexander, Head, Environmental Planning Division, Arkansas Department of Planning, responded to Colonel Morris' letter, stating, *inter alia*:

". . . I wish to note that our correspondence with the BOR did not specifically recommend that the Cossatot be so designated, but was in response to a request for suggestions as to outstanding scenic and recreational rivers in Arkansas which might be included in a study list which is being compiled by the BOR to evaluate possible inclusion in a list of rivers which might be recommended as components of the National Wild and Scenic River System. . . .

"We do believe that the Cossatot has outstanding qualities which would merit its consideration for designation as a wild and scenic river, and our comments included on the suggestions that this stream be added to the study list for such rivers. It is also our belief that this possibility provides an alternative to other plans which have been developed for this river, and that such an alternative should be considered as an alternative."

Mr. Roy Wood, the Atlanta office Regional Director of BOR, testified at this latest hearing as a witness for the plaintiffs. He indicated that the BOR had treated Mr. York's letter of June 16, 1971, as a recommendation that the Cossatot be designated as a scenic river and was proceeding accordingly.

It appears from Mr. Wood's testimony that his office has recommended the Cossatot, and it apparently is on the

"5D list", specifying streams approved for study jointly by the Secretary of the Interior and by the Secretary of Agriculture. Mr. Wood was unable to give the Court any specific time frame within which further decisions or actions might be made or taken with respect to the Cossatot under the Wild and Scenic Rivers Act.

The Corps of Engineers did not write to Mr. Wood requesting a copy of the June 16, 1971, letter which he had received from Mr. York, but, as noted above, they did make the effort to obtain a copy of that letter directly from the Arkansas Department of Planning. It also appears from the evidence that neither the Arkansas Department of Planning nor any other agency of the State of Arkansas has written to Mr. Wood or to the BOR to withdraw the recommendation of June 16, 1971.

From all the above, the Court cannot find, as claimed by the plaintiffs, that the statement in the EIS that "the State of Arkansas has not designated, recommended, or asked for any action on the Cossatot pursuant to the Wild and Scenic Rivers Act" is not true. Certainly it was not intentionally false and, from all the facts, it can only be fairly said that the position of the State of Arkansas on the issue is ambiguous, probably reflecting the efforts of the various protagonists to affect state action.

█ It is clear that Mr. Wood has strong views on the desirability of preserving the Cossatot as a free-flowing river. The proposed dam would, in his words, "cut the heart out of it as a free-flowing river". The Court finds Mr. Wood to be very sincere in this opinion, and further finds that that personal opinion also represents the official position of the BOR as reflected by the

evidence. Nevertheless, the Court finds that the EIS is sufficient to alert the decision-maker to the problem. And, so alerted, the decision-maker can make such further inquiry as might be deemed necessary, useful or helpful.

█ The defendants, immediately prior to the hearing on April 27, 1972, renewed their challenge to the standing of the various plaintiffs as a result of the decision of the United States Supreme Court in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (decided April 19, 1972). The plaintiffs were permitted to orally amend the complaint to, in effect, allege the personal involvement by many of the members of the various plaintiff organizations, as well as of the two named, individual plaintiffs, in the use and benefit of the Cossatot as a free-flowing stream. Under the new allegations all plaintiffs contend that they, or members of plaintiff organizations,[3] would be injured, in fact, by the damming of the Cossatot. Evidence in accordance with these new allegations was received at the hearing and, on the basis of all of the evidence and the law, the Court concludes that the decisions previously made by it with respect to the standing of the various plaintiffs should now be reaffirmed.

Finally, some general comments:

█ If this Court is correct in its interpretation of the NEPA, the plaintiffs here cannot look to the judiciary to reverse or modify any decision with respect to the building of the embankment across the Cossatot. If that decision is to be changed or modified, it must be through the actions of the appropriate decision-makers in the executive or legislative branches of our government. The judiciary can delay the construction

---

3. The Court ruled in its Memorandum Opinion Number Two, Environmental Defense Fund, Inc., et al. v. Corps of Engineers of the United States Army et al., 325 F.Supp. 728 at 736 (E.D.Ark.1971), that the plaintiff non-profit membership organizations had standing to represent the active members of those organiza-

tions, and the Court further instructed said plaintiffs to notify their members of the pendency of this suit. Defendants did not, at that time, contend, nor do they now contend, that plaintiff organizations do not have the standing to represent their active members.

of the dam pending compliance by the defendants with the congressionally mandated provisions of the NEPA but, ultimately, plaintiffs' only chance to stop the dam, or to alter same, lies in their ability—perhaps with the aid of others —to convince the decision-makers of the wisdom and correctness of their views on the merits.

■ The NEPA sets up certain requirements which, if followed, will insure that the decision-maker is fully aware of all the pertinent facts, problems and opinions with respect to the environmental impact of the proposed project. But the plaintiffs are not relegated solely to the provisions of the NEPA in contacting, and attempting to influence, those decision-makers. In addition, there are formal and informal, direct and indirect, means which the plaintiffs, and other citizens, may use in their attempt to reach and influence those decision-makers. The Court mentions this because it is obvious that the Congress must have been aware of such alternative methods of communication when it enacted the NEPA. The environmental impact statement is not to be equated to a trial court record which is examined on appeal by a higher court. Although the impact statement should, within reason, be as complete as possible, there is nothing to prevent either the agency involved, or the parties opposing proposed agency action, from bringing new or additional information, opinions and arguments to the attention of the "upstream" decision-makers even after the final EIS has been forwarded to CEQ. So it is not necessary to dot all the I's and cross all the T's in an impact statement.

Congress, we must assume, intended and expected the courts to interpret the NEPA in a reasonable manner in order to effectuate its obvious purposes and objectives. It is doubtful that any agency, however objective, however sincere, however well-staffed, and however well-financed, could come up with a perfect environmental impact statement in connection with any major project.

Further studies, evaluations and analyses by experts are almost certain to reveal inadequacies or deficiencies. But even such deficiencies and inadequacies, discovered after the fact, can be brought to the attention of the decision-makers, including, ultimately, the President and the Congress itself. All of the usual methods of communication, political and otherwise, are still available for this purpose.

■ The Court does not believe that the Congress intended that the NEPA be used as a vehicle for the continual delay and postponement of legislative and executive decisions. From the very beginning of this case the Court has emphasized the freedom of the defendants to comply with the provisions of the NEPA and thereby to avoid the injunctive power of the courts. In the months between the filing of this action and the hearing upon the merits, the defendants could have complied with the Act and thereby have avoided the injunction. They chose, however, to stand upon a 12-page environmental impact statement, which, admittedly, was a mere recast of information already in defendants' files. Now, after having been enjoined, pending compliance with the NEPA, they have filed a voluminous report which, the Court is advised, cost the taxpayers approximately a quarter of a million dollars. The Court cannot say that either the costs or the delays were necessary or justified in this case. In any event, those costs and delays were occasioned by the defendants' failure to comply with the law.

■ The Court is satisfied that the new EIS, although obviously not as fair and impartial and objective as if it had been compiled by a disinterested third person, meets the full disclosure requirements of the NEPA and is a record upon which a decision-maker could arrive at an informed decision. It may be that that decision-maker, in order to fully comprehend the objections and arguments advanced by the plaintiffs and others who oppose the project, will have to look carefully into the "back pages"

and the appendices of the EIS. But there is no way that he can fail to note the facts and understand the very serious arguments advanced by the plaintiffs if he carefully reviews the entire environmental impact statement. Whether that decision-maker is influenced by such facts, opinions and arguments, or whether such facts, opinions and arguments cause that decision-maker to call for further studies and investigations, is another matter—not one over which this, or any other court, has any control.

The Court reaffirms the conclusions of law set forth in its prior decisions in this case. 325 F.Supp. 728 and 325 F. Supp. 749 (1971).

The defendants, having now complied with the law, are no longer acting *ultra vires*. The basis of the Court's jurisdiction has therefore been removed. The injunction will be vacated and the case dismissed.

### APPENDIX

Excerpts from Letters to Counsel

March 22, 1972

Gentlemen:

Because it was necessary to call off the conference about the above case, scheduled for March 16, the Court feels that it should set forth its thinking with respect to some of the issues raised by the defendants' motion for summary judgment, those issues being reflected in the briefs filed by the plaintiffs on February 7, 1972, and by the defendants on March 3, 1972.

The defendants take the position that there is no genuine issue as to any material fact, and contend that they are entitled to an order setting aside and vacating the present injunction as a matter of law. The plaintiffs urge that genuine issues as to material facts remain and that, even independent of the resolution of those factual issues, they would be entitled to a continuation of the injunction upon the basis of the defendants' failure to fully comply with all of the provisions of the National Environmental Policy Act of 1969.

Under the circumstances I think it would be best to deal in this letter with certain of the plaintiffs' contentions with respect to the existence of factual issues since, if any remain, they should be disposed of before taking up those issues which admittedly deal exclusively with questions of law.

Mr. Arnold first contends that the new and final Environmental Impact Statement "is not impartial and objective". He offers to support this contention by submitting proof which he asserts will show the bias of Colonel Vernon W. Pinkey, erstwhile District Engineer of the Tulsa District, under whose direction plaintiffs contend, "the process of compiling the new Environmental Impact Statement was begun and, to a large extent, completed . . .". To show Colonel Pinkey's bias, plaintiffs intend to rely upon certain statements which they contend he made at a meeting of the Chamber of Commerce at DeQueen, Arkansas, on Monday, March 29, 1971. At the public hearing held by the defendants on August 31, 1971, at Fort Smith, Arkansas, the plaintiffs appeared and made written objections to Colonel Pinkey's alleged remarks, claiming that they constituted evidence of bias and prejudice sufficient to vitiate the defendants' attempt to comply with the Court's orders. See Exhibit 11 to the "Record of Public Meeting on Environmental Impact Statement, Gillham Lake, Arkansas", which has been filed as part of the Environmental Impact Statement (hereinafter sometimes referred to as "EIS").

Plaintiffs also contend that an examination of the final EIS offers, in itself, evidence of bias and prejudice. Additionally, plaintiffs contend that a letter from Colonel Carlyle H. Charles, Assistant Director of Civil Works for Plains Divisions of the Corps of Engineers, to the Honorable Bill Alexander, dated August 27, 1971, substantiates their charge of bias. Finally, plaintiffs contend that further evidence of the defendants' bias

"is shown by the fact that, immediately upon the filing of EIS with CEQ, defendants moved this Court to vacate the injunction." They contend that this was a clear violation of the CEQ guidelines and that defendants should have waited at least thirty days from January 10, 1972, before deciding to proceed with the project and before making their motion to vacate the injunction.

To establish a factual basis for certain of their contentions regarding bias, plaintiffs filed a Request for Admissions on February 7, 1972. The defendants responded on March 7, 1972. The result establishes the following facts: that Colonel Vernon W. Pinkey was District Engineer in charge of the Tulsa District, Corps of Engineers, United States Army, during that portion of calendar year 1971 ending July 31, 1971; that the preparation of the EIS on Gillham Dam was under the supervision of Colonel Pinkey or of employees subordinate to him up until July 31, 1971; that most of the data for the draft statement of the EIS had been accumulated by July 31, 1971, and the rough organization of the statement had been worked out by that date; that the draft EIS was mailed to interested parties from a mailing list (compiled by the Tulsa District) on August 6, 1971; and that the draft EIS was filed with the Council on Environmental Quality on August 26, 1971. The defendants deny that Colonel Pinkey made the statements on March 26, 1971, as attributed to him in the *DeQueen Daily Citizen* on March 29, 1971. Defendants contend that the correct import of any statement made by Colonel Pinkey at the time referred to in the newspaper article is set forth in an affidavit of Colonal Pinkey filed with this Court on March 3, 1972.

Plaintiffs state that on Friday, March 26, 1971, Colonel Pinkey appeared at a meeting of the Chamber of Commerce at DeQueen, Arkansas, and assured his listeners that the three authorized projects in the DeQueen area, the Gillham, Dierks and DeQueen dams, would definitely be constructed. They contend that

he stated, among other things, "there is no doubt about them being completed" and "I assure you these three dams are going to be built". In their Request for Admissions No. 6, supra, the plaintiffs ask the defendants to admit "that on March 26, 1971, Colonel Pinkey made, in DeQueen, Arkansas, substantially the statements attributed to him in the attached newspaper articles appearing in the *DeQueen Daily Citizen* on March 29, 1971, pages 1, 2 and 6". The statements attributed to Colonel Pinkey on said pages of the newspaper are as follows:

"Pinkey said the case (Judge G. Thomas Eisele issued an injunction Feb. 19 in federal district court against further construction at Gillham) had been turned over to the justice department, and 'I can't tell you what the justice department is going to do.'

"No appeal has as yet been filed, but Pinkey said the deadline for filing such an appeal now is April 19.

"Speculating on the possibility that an appeal would be filed, the Tulsa man said that if such an appeal were successful, bid for final construction at Gillham could be advertised late in the fall, could be opened in January or February and the job could be contracted so that actual work could start about June, 1972.

" 'But it (the injunction) has cost us a year,' Pinkey said.

"That is because construction of the coffer dams to divert the river during dam construction has to start in a dry period for the protection of the contractor.

"After the ecologists filed suit against construction of the dam, a presidential decree suspended terms of the Davis-Bacon act (minimum wage) on all federal projects on which contract had not been awarded.

"All such jobs now have to be re-advertised.

" 'That,' the colonel said, 'killed it for this year,' because the Gillham job can't be re-advertised.

"He said the low bidder on the project had submitted a favorable bid some $600,000 under the second lowest bidder, and about $800,000 under the government's estimate.

" 'The reservoir could be completed in 1974 if all goes well,' the Tulsan said.

"Speaking of the three authorized projects in this area (Gillham, Dierks and DeQueen) Pinkey said 'there is no doubt about them being completed.'

"He charged that local groups should be oganized now to 'show concern with anything to do with the lakes'.

" 'After they are completed is what counts,' he said.

"One suggestion was that zoning regulations should be considered even now, before developers have a chance to erect buildings or establish types of business that would detract from the recreational value of the reservoirs.

"Pollution, water safety, law and order were other items of concern which should be handled by local organizations, he said.

" 'They're going to be here, and they belong to you,' he pointed out.

\* \* \* \* \* \*

"After reviewing the status of Dierks and DeQueen reservoirs, the colonel prefaced his review of the Gillham project with:

" 'We're planting some trees up there now.'

"The colonel early caught his audience by surprise by asking, as teacher to second-grade class, how much had been asked in appropriations for the three reservoirs. When no one apparently wanted to answer the question, he said:

" 'If you don't know how much is in the budget, you're not concerned with the three lakes.'

"It was then he suggested the organization of an area-wide group.

"On another matter, the colonel urged his listeners:

" 'Don't start a fight with the conservationists. It won't pay off. Forget it.'

"He also urged them to continue to stick to the truth.

" 'If you have a good product you don't need to color the truth, and you have a good product.'

"And as a parting shot, he reiterated:

" 'I assure you these three dams are going to be built.'

"The colonel was introduced by Larry Hale, chamber president.

\* \* \* \* \* \*

"His audience hadn't had sufficient time to warm up yet when Col. Vernon W. Pinkey made with his first 'jolly' Friday noon.

"The colonel allowed as how he probably would have shown up with his pith helmet, with the words 'Keep Busy' emblazoned thereon.

"When there wasn't even a titter, the colonel was equal to the occasion:

" 'I presume from the lack of response you people don't read the Arkansas Gazette.'

"The Gazette, it might be pointed out, featured at least two editorial cartoons during the Cossatot controversy showing the 'big bad corps' with the pith helmet, muscling its way past the conservationists—or trying to.

"The colonel, understandably, touched lightly on the controversy, but did tell his listeners that with the proper organization to start with, 'you could have whipped those birds before they got started.'

"He meant, of course, that the dam could have been completed before the conservationists mustered their forces to keep the Cossatot a free-flowing stream."

[As indicated, the defendants refused to admit that Colonel Pinkey made the statements attributed to him in the newspaper article. They refer the Court to

the Colonel's affidavit of March 3, 1972. That affidavit is as follows:

"I, Vernon W. Pinkey, Colonel, USA Retired, being fully sworn upon oath, depose and say:

"(1) That I was the district engineer of the Tulsa District, Corps of Engineers, through July 31st, 1971, on which date I retired from the military service.

"(2) That I am aware that I have been accused of bias with regard to Gillham Dam on the Cossatot River, Arkansas, and that I utilized my position to insinuate my bias into the environmental impact statement on that project. That evidence of that bias is alleged as a result of an article in the DeQueen newspaper.

"(3) That to the allegations of bias and influence on the environmental impact statement, I make the following statements:

"(a) The article printed in the newspaper is not a complete quotation to my extemporaneous response to a question by an individual at the dinner. In essence, I stated, 'I am convinced that someday these lakes will be built. It may not be for 30 years, but the people will find that they have a need for them.'

"(b) When the District launched its effort to prepare the environmental impact statement, I only made three decisions with regard to its content. These were, that it would be comprehensive, that it would be a full disclosure, and that it would be laid out according to the explosion diagram which accompanied the draft statement.

"(c) I never saw the text that was developed during this period nor did I discuss its content with those who were charged with its development, because in the rush of work to prepare for the dedication of the McClellan-Kerr Waterway by the President of the United States in June and afterwards in the preparation for the termination of my tenure as district engineer and my retirement from the military service, I was too busy to discuss any aspect of the environmental impact statement, other than schedules for its preparation and mailing."]

The Court assumes that it has now reviewed all of the evidence which plaintiffs would tender to the Court in support of their contention that the final EIS was not objective and impartial. Whether a genuine issue of material fact exists will depend upon the Court's conclusion as to the requirements of the National Environmental Policy Act of 1969 (hereinafter "NEPA") with respect to the impartiality and objectivity of the officials and employees of responsible governmental agencies in the discharge of their duties under that law.

Plaintiffs contend that if the defendants admit that Colonel Pinkey made the statements attributed to him in the newspaper, then, "defendants' new EIS is deficient as a matter of law". They contend that there is "a quasi-judicial duty to inquire and evaluate objectively". They urge that it is not necessary for the Court to find that the defendants acted in actual bad faith.

In support of their contentions as to the law on this subject, plaintiffs quote from one of this Court's opinions in this very case as follows, "The Congress of the United States is intent upon requiring the agencies of the United States government . . . to *objectively* evaluate all of our projects . . ." (emphasis supplied). See 325 F.Supp. 728 at 746. They also cite Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), to the effect that studies with regard to environmental efforts must not be simply *"post hoc* rationalizations", and they quote from Environmental Defense Fund, Inc. v. Hardin, 325 F.Supp. 1401 (D.D.C.1971), as follows: "The act envisions that program formulation will be directed by research results rather than that research programs will be designed to substantiate programs already decided upon".

In their turn, the defendants also cite the case of Citizens to Preserve Overton Park, Inc. v. Volpe, supra, quoting from it as follows:

"[I]nquiry into the mental processes of administrative decision makers is usually to be avoided. United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 1004–1005, 85 L.Ed. 1429 (1941). And where there are administrative findings that were made at the same time as the decision, as was the case in *Morgan*, there must be a strong showing of bad faith or improper behavior before such inquiries may be made."

The defendants in their brief also state that the alleged remarks of Colonel Pinkey are irrelevant. They point out that, as District Engineer, he was responsible for the first draft of the impact statement. Then the draft was sent to the Divisional Engineer who reviewed it and made his report. Then the statement was referred to the Chief of Engineers who again re-studied it and made his recommendations to the Office of the Secretary of the Army. The Secretary of the Army then reviewed the impact statement and submitted same to the Office of Management and Budget. After these reviews the statement was submitted to the Council on Environmental Quality and, through it, to the President of the United States and the Congress. (Note: Proof that the particular EIS followed these procedures is not before the Court. The Court calls upon the defendants to submit and file an affidavit establishing same, and it will be deemed admitted, if not controverted by affidavits submitted by the plaintiffs within ten days of said filing.) Defendants contend that any statement by Colonel Pinkey would be one made by him as an individual setting forth his personal views and cannot be taken as the position of the United States Army or the Corps of Engineers, or as binding upon it, citing Congress Construction Co. v. United States, 314 F.2d 527, 161 Ct.Cl. 50 (1963), cert. den., 375 U.S. 817, 84 S.Ct. 53, 11 L.Ed.2d 52.

The defendants also argue that the plaintiffs' contention that the defendants violated the guidelines by filing their motion to vacate the injunction within thirty days of the filing of the EIS misses the intent of the guidelines which states, "no *administrative action* subject to Section 102(2) (C) is to be taken sooner than . . ." (emphasis supplied).

The Court's opinion as to the objectivity and impartiality required by NEPA in the preparation of impact statements, and in the impact statements themselves, is at variance with the position of the plaintiffs and possibly at variance with the position of the defendants.

It is true that this Court and other courts have made it clear that NEPA requires the agencies of the United States government to objectively evaluate their projects. But the kind and degree of objectivity must be inferred from the provisions, policies and objectives of NEPA.

The Congress did not choose to vest in an independent administrative or quasi-judicial agency the function and responsibility of preparing and compiling environmental impact statements. Rather, they placed that obligation directly upon the federal agencies whose proposed acts (or proposals for legislation) were likely to have an impact upon the environment. By so doing, Congress consciously, it must be asssumed, placed this responsibility upon the very public servants who, by the nature of things, would probably be the least objective in reporting facts and urging arguments which would tend to negate the wisdom of projects within the traditional mission of such agencies. They chose to rely upon self-analysis and self-examination rather than upon independent analysis or examination. One cannot divine all of the practical and philosophical arguments that preceded the adoption of such a legislative policy, but among them might well have been the attitude that self-analysis would, among other things, produce an additional benefit by forcing the development in each of such federal agencies of a broader perspective and an

increased awareness of the role of such agencies and of the impact of the acts of such agencies in the broader scheme of things. Whatever the reasons, it is clear that Congress was not looking for the type of objectivity and impartiality that one would expect from judicial, quasi-judicial, or even independent administrative tribunals. Indeed it might be doubted that Congress would ever intend or desire that federal "action" agencies be staffed solely with objective and impartial administrators, at least as pertains to the mission of such agency. In such agencies, as within any goal-oriented organization, one looks for commitment rather than neutrality. Frequently Hamlets do not serve such agencies as well as dedicated, purposeful individuals who *believe in* the programs committed to their care and control by the Congress. To dam builders the structure of the embankment and its mechanical and engineering accoutrements and the lakes impounded thereby must be the ultimate in beauty. No one should expect it to be otherwise. In like manner, all such structures might well be anathema to officials in environmental protection agencies.

Now, the Congress, having placed the responsibility for identifying and reporting the environmental impacts of federal projects upon the very agencies which are charged with the administration of such projects, nevertheless has clearly required of such agencies that they objectively report and evaluate those impacts. In such a context, what kind of objectivity was it looking for?

At a minimum, the involved federal agency must make a good faith effort to comply with the provisions of NEPA. It is clear, however, that it is possible for federal officials and federal employees to comply in good faith with that Act even though they personally oppose its philosophy, are "anti-environmentalists", and have unshakable, preconceived attitudes and opinions as to the "rightness" of the project under consideration.

The Congress has avoided the "objectivity" problem to a certain extent by specifying just what is required of the agency preparing the impact statement. NEPA requires that a "detailed statement" be prepared by "the responsible official" on:

"(i) The environmental impact of the proposed action.

"(ii) Any adverse environmental effects which can be avoided should the proposal be implemented.

"(iii) Alternatives to the proposed action.

"(iv) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

"(v) Any irreversible or irretrievable commitment of resources which would be involved in the proposed act, should it be implemented."

And his agency must also study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.

It is inevitable in situations like this that there will be practically irreconcilable conflicts of opinion. It is clearly not the role of the Court to resolve such conflicts or to make any independent judgments of its own as to the correctness or wisdom of the ultimate decision of the responsible administrator. Nor must those officials in the agency involved abandon their own opinions in favor of contrary or varying opinions. It is sufficient that all such known contrary or varying opinions be noted so that they may be considered "up the line" and, indeed, ultimately by the CEQ, the President and the Congress itself.

With respect to the arguments on the "objectivity" issue advanced by Mr. Arnold in his letter of March 28, 1972, the Court has a few comments: I agree with Mr. Arnold that Congress, in enacting NEPA, intended to introduce environmental considerations into the decision-

making process and thereby to substantially affect that process. I further agree that Congress expected even "action" agencies to give serious and, hopefully, open-minded consideration to such factors.

Mr. Arnold suggests that officials in "action agencies" must be objective *before* a decision to proceed with a certain project has been made, even though they may be "committed" *after* a decision to go forward with a project has been made. One of the difficulties here is that the challenge has come after the overall project was approximately two-thirds complete. In other words, the decision to go forward had been made and the "commitment" to carry through assumedly established. Nevertheless, NEPA does apply to ongoing projects and, generally, the type of impact statement required for such projects is essentially the same as for new projects. But it is not reasonable to expect that officials in the latter instance will be quite as openminded as they would be with respect to new projects. And, indeed, the degree of completion of the project might, even to the most' open-minded official, tilt the balance in favor of going on with such an *in esse* project in circumstances where, if the project had not commenced, a contrary decision might be made. So much for general comments.

In the Court's letter of March 22, 1972, it pointed out that "at a minimum, the involved federal agency must make a good faith effort to comply with the provisions of NEPA". In his letter of March 28, Mr. Arnold states that NEPA does not permit impact statements to "be consciously slanted or biased". I agree, believing that a contrary view would negate the requirement of good faith. But I emphasize the word "consciously", which carries with it the inference of intentional misrepresentation. Elsewhere in his letter Mr. Arnold states that, although inquiring into the mental processes of administrators is usually to be avoided, there is "an exception to this rule in the case of bad faith or improper behavior", citing the *Overton Park* opinion. Once again, I agree with the principle stated, but I do not believe that the alleged acts of Colonel Pinkey would constitute "improper conduct" within the meaning of the *Overton Park* case.