**SIERRA CLUB et al., Plaintiffs-Appellants,**

v.

**Robert F. FROEHLKE, Secretary of the Army, et al., Defendants-Appellees,**

**and**

**Miland and Doris Slayback et al., Intervenors-Appellees.**

**No. 72-1833.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 21, 1973.

Decided Oct. 2, 1973.

948

Frank M. Tuerkheimer, Madison, Wis., for plaintiffs-appellants.

Kent Frizzell, Asst. Atty. Gen., Terrence L. O'Brien, Atty., Dept. of Justice, Washington, D. C., John O. Olson, U. S. Atty., Madison, Wis., David E. Beckwith, John S. Skilton, Milwaukee, Wis., for defendants-appellees.

Before CUMMINGS, Circuit Judge, GRANT,* Senior District Judge, and GORDON,** District Judge.

GRANT, Senior District Judge.

The primary issue raised by this appeal is whether an environmental impact statement prepared by the Corps of Engineers concerning a flood control dam project on the Kickapoo River, Wisconsin, complied with the mandates of the National Environmental Policy Act of 1969 (hereinafter NEPA).[1] A secondary question is whether the failure of the Corps of Engineers to request and obtain local assurances of participation from two downstream communities voided the project. The district court answered the former question in the affirmative and the latter in the negative. We affirm.

In 1962 Congress authorized[2] the construction of a flood control dam on the Kickapoo River, a free-flowing river with a history of annual destructive floods, located in the southwestern section of Wisconsin. The final design for the dam specified a height of 103 feet with an over-all length of 3,960 feet. The dam would create a reservoir covering 1,780 acres and result in the inundation of approximately 12 miles of the river between the communities of La-Farge and Ontario. This section of the river is popular with canoeists and noted for its picturesque bluffs and sandstone ledges containing rare floral plants. The project also involved supplemental

* Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation.

** District Judge Myron L. Gordon of the Eastern District of Wisconsin is sitting by designation.

1. 42 U.S.C. § 4321 et seq.

2. 76 Stat. 1180, 1190 (1962).

flood protection levees at two small downstream communities, for which both communities were required to make cost-sharing commitments.

The Corps had initially prepared a draft environmental impact statement in November of 1970. After publication of the statement and review by state and local agencies, environmental groups, etc., a final environmental impact statement was prepared and forwarded to the Council on Environmental Quality on April 18, 1972. As correctly noted by the Court below, the statement

> . . . is a voluminous document, consisting of 78 pages of text and 400–500 pages of plates and appendices. The EIS is organized under eight headings which correspond closely to the subject matter required under § 4332(2)(C), NEPA: Project Description; Environmental Setting without the Project; Environmental Impact of the Proposed Action; Adverse Environmental Effects which Cannot be Avoided Should the Project be Implemented; Alternatives to the Proposed Action; Short-Term Uses of Man's Environment as Compared to Maintenance and Enhancement of Long-Term Productivity; Irreversible or Irretrievable Commitments; Coordination with other Agencies; and Conclusion. Each of the above subjects is divided into numerous subdivisions. All told, fourteen alternatives for flood control, fish and wildlife management, and recreation are considered in the report. Comments on the final draft were requested from 20 federal and state agencies and officials and private organizations and individuals (including plaintiff herein, Sierra Club, John Muir Chapter). Comments were received and incorporated in the EIS from fifteen persons and organizations who responded.

Sierra Club v. Froehlke, 345 F.Supp. 440, 443 (W.D.Wis.1972).

Plaintiffs filed suit in the district court with four counts of their complaint alleging, in effect, that the Corps' environmental impact statement was inadequate in violation of § 102 of the National Environmental Policy Act and, therefore, that continuation of the project was enjoinable under the Administrative Procedure Act. A fifth claim alleged that the project was enjoinable under the Administrative Procedure Act because the requests for local assurances of participation on the project had not been made and received as required by law. Plaintiffs filed a motion for a preliminary injunction with supporting affidavits and legal memoranda. Defendants and intervenors filed counter-affidavits and memoranda of law. The motion was denied by the trial court on 2 June 1972. *Ibid.* Defendants and intervenors then filed a motion for summary judgment which was granted by the court on 24 July 1972, the court finding that the "environmental statement provided adequate notice to all concerned persons, agencies, and organizations, of the probable environmental consequences of the proposed project." App. at 50a.

Plaintiffs argue that the statement is inadequate in that the Corps failed to consider useful existing studies, misstated water quality problems, failed to conduct vegetation studies with particular reference to the unique flora of the river's cliffs which would be inundated by the dam-lake, overstated the beneficial effects of the project, understated the detrimental effects and failed to give proper consideration to available alternatives. Plaintiffs further argue that the district court utilized the wrong test or standard in determining the sufficiency of the statement. They contend that the court's "notice of problems" test is improper.

The Corps argues that the impact statement objectively meets the requirements of NEPA noting that the statement treats the five specific subject areas set forth in § 4332(2)(C), NEPA.[3] They contend that plaintiffs'

---

3. The basic policies and goals of NEPA are contained in Section 101. (42 U.S.C. § 4331). Section 102 (42 U.S.C. § 4332) provides the methods by which the environmen-

real point is that the agency decision-makers did not accord some factors the weight which plaintiffs would assign them. In response to plaintiffs' contention that the statement demonstrates bias and partiality by the Corps rather than objectivity, the Corps argues that it "is obviously not required to give the same weight to plaintiffs' concern as plaintiffs do," Hanly v. Mitchell, 460 F.2d 640, 648 (2nd Cir. 1972), cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256, and that some bias is even to be expected, citing Environmental Defense Fund v. Corps of Eng., U. S. Army, 470 F.2d 289 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). The Eighth Circuit Court of Appeals stated in that case as follows:

. . . NEPA assumes as inevitable an institutional bias within an agency proposing a project and erects the procedural requirements of § 102 to insure that "there is no way [the decision-maker] can fail to note the facts and understand the very serious arguments advanced by the plaintiffs if he carefully reviews the entire environmental impact statement." [Environmental Defense Fund v. Corps of Eng., U. S. Army,] 342 F.Supp. [1211] at 1218. An institutional bias

will most often be found when the project has been partially completed. *Id.* at 295.

The court concluded that "[T]he test of compliance with § 102, then, is one of good faith objectivity rather than subjective impartiality." *Id.* at 296.

■■ Federal agencies are required to demonstrate objectivity in the treatment and consideration of the environmental consequences of a particular project, Environmental Defense Fund, *supra,* 470 F.2d at 295; Environmental Defense Fund v. Corps of Eng., U. S. Army, 348 F.Supp. 916, 927 (N.D.Miss. 1972). The detailed statement of the environmental consequences required by § 102 "must be sufficiently detailed to allow a responsible executive to arrive at a reasonably accurate decision regarding the environmental benefits and detriments to be expected from program implementation." Environmental Defense Fund v. Hardin, 325 F.Supp. 1401, 1403–1404 (D.D.C.1971). Stated slightly differently, the statement must provide "a record upon which a decision-maker could arrive at an informed decision." Environmental Defense Fund v. Corps of Eng., U. S. Army, 342 F.Supp. 1211, 1217 (E.D.Ark.1972), aff'd (8th Cir.), 470 F.2d 289.

tal goals will hopefully be achieved. The latter section provides, in pertinent part, as follows:

The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall —

  (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
  (i) the environmental impact of the proposed action,
  (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
  (iii) alternatives to the proposed action,
  (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

  (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, [United States Code] and shall accompany the proposal through the existing agency review processes;

In the instant case, plaintiffs argue that Judge Doyle's finding "that the agency at least recognizes and puts interested persons on notice of problems which exist in these areas [of siltation, water quality, vegetation and identification and discussion of alternatives]," 345 F.Supp. at 444, constitutes a "notice of problems" test which is less demanding than a requirement that the environmental impact statement "be a record upon which a decision-maker could arrive at an informed decision." 342 F. Supp. at 1217. If this were the only finding made by the district court, we might be inclined to agree with plaintiffs' argument. However, the court also found that plaintiffs had not shown a sufficient probability of success on the merits as to their "contention that the statement in its present form does not constitute 'full disclosure'" of the environmental consequences of the project "as required by NEPA." 345 F.Supp. at 444. The court also concluded that plaintiffs had "failed to show a sufficient chance of success on the merits of a contention that the present statement is not a record upon which a decision-maker could make an informed decision." *Id.* at 445. These contentions were later decided adversely to the plaintiffs upon the basis of the entire record. App. at 50a. With reference to plaintiffs' contention that the Corps failed to conduct certain studies in addition to those which were conducted, the district court correctly noted that NEPA

> does not require that every conceivable study be performed and that each problem be documented from every angle to explore its every potential for good or ill. Rather, what is required is that officials and agencies take a "hard look" at environmental consequences. *Id.* at 444.

Or as observed in *Environmental Defense Fund, supra,* 342 F.Supp. at 1217:

> It is doubtful that any agency, however objective, however sincere, however well-staffed, and however well-financed, could come up with a perfect environmental impact statement in connection with any major project. Further studies, evaluations and analyses by experts are almost certain to reveal inadequacies or deficiencies.

We concede that a requirement that the agency take a "hard look" [4] at the environmental consequences, like the "notice of problems" test, might be, in and of itself, "a singularly inappropriate test for reviewing the adequacy of an impact statement," as suggested by the plaintiffs. Nevertheless, the various statements and findings made by the district court in the case at bar demonstrate an awareness by the court of several standards of review utilized by other courts. We are inclined to agree with the intervenors that any differences in the prescribed tests and standards are semantic and that each of them serves as a means of ensuring that an agency's impact statement will "alert the public, other interested agencies, the Council on Environmental Quality, the President, and the Congress of possible environmental consequences of proposed agency action." [5] In any event, we interpret the district court's opinions as a finding that the Corps objectively and comprehensively considered the environmental consequences of the proposed project.

A second, and perhaps more important, test or standard of review contended for by the plaintiffs is that the district courts have an obligation to review substantive agency decisions on the merits to determine if they are in accord with NEPA. Several courts have recently held that such an obligation exists. As stated by the Eighth Circuit Court of Appeals,

> The unequivocal intent of NEPA is to require agencies to consider and give effect to the environmental goals set forth in the Act, not just to file

---

4. Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 838 (1972).

5. *Sierra Club, supra,* 345 F.Supp. 444.

detailed impact studies which will fill governmental archives.

The application of the substantive principles of NEPA is to be made by the agency through a "careful and informed decisionmaking process." Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, supra [146 U.S.App.D.C. 33] 449 F.2d [1109] at 1115. The agency must give environmental factors consideration along with economic and technical factors. "To 'consider' the former 'along with' the latter must involve a balancing process." Id. at 1113.

Given an agency obligation to carry out the substantive requirements of the Act, we believe that courts have an obligation to review substantive agency decisions on the merits. Whether we look to common law or the Administrative Procedure Act, absent "legislative guidance as to reviewability, an administrative determination affecting legal rights is reviewable unless some special reason appears for not reviewing." K. Davis, 4 Administrative Law Treatise 18, 25 (1958). Here, important legal rights are affected. NEPA is silent as to judicial review, and no special reasons appear for not reviewing the decision of the agency. To the contrary, the prospect of substantive review should improve the quality of agency decisions and should make it more likely that the broad purposes of NEPA will be realized.

Environmental Defense Fund, supra, 470 F.2d at 298–299.

As to the specific standard of review to be applied, the Court held that

The standard of review to be applied here and in other similar cases is set forth in Citizens to Preserve Overton Park v. Volpe, supra, 401 U. S. [402] at 416, 91 S.Ct. [814] at 824, [28 L.Ed.2d 77]. The reviewing court must first determine whether the agency acted within the scope of its authority, and next whether the decision reached was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In making the latter determination, the court must decide if the agency failed to consider all relevant factors in reaching its decision, or if the decision itself represented a clear error in judgment.

Where NEPA is involved, the reviewing court must first determine if the agency reached its decision after a full, good faith consideration and balancing of environmental factors. The court must then determine, according to the standards set forth in §§ 101(b) and 102(1) of the Act, whether "the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values." Calvert Cliffs' Coordinating Committee v. U.S. Atomic Energy Commission, supra, 449 F.2d at 1115.

Id. at 300.

The Fourth Circuit has expressly adopted the holding of the Eighth Circuit. Conservation Council of North Carolina v. Froehlke, 473 F.2d 664, 665 (4th Cir. 1973). The Fifth Circuit and the District of Columbia Circuit appear to be in accord. Save Our Ten Acres v. Kreger, 472 F.2d 463, 466 (5th Cir. 1973); Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).

While this court has never considered the test or standard to be utilized in determining whether an environmental impact statement complies with NEPA and whether district courts have an obligation to review substantive agency decisions on the merits, the court has had an opportunity to discuss the importance of the National Environmental Policy Act, in particular, the requirements of Sections 101 and 102:

Through the enactment of these procedural requirements the Congress has not only permitted but has compelled the responsible federal agencies to take environmental values into ac-

count. . . . Not only must the environmental consequences of a particular action be considered, but Section 102 requires also that these consequences be weighed and balanced against other considerations, such as financial or social, which may be involved.

The environmental impact statement required by Section 102 is designed to insure that this balancing analysis is given its fullest effect. *Pro forma* compliance with the substantive guidelines of Section 101 simply will not suffice. Section 102 of NEPA provides that its procedures be implemented and carried out "to the fullest extent possible." Scherr v. Volpe, 466 F.2d 1027, 1031 (7th Cir. 1972).

■ In light of these statements, we feel compelled to hold that an agency's decision should be subjected to a review on the merits to determine if it is in accord with the substantive requirements of NEPA. The review should be limited to determining whether the agency's decision is arbitrary or capricious. "The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 77 (1971).

■ In the instant case, the district court did not conduct a review on the merits. Although a remand would be the normal procedure, we do not believe a remand is required.[6] After reviewing the environmental impact statement prepared by the Corps, we are convinced that the Corps "reached its decision after a fair, good faith consideration and balancing of environmental factors," and that its decision is neither arbitrary nor capricious.[7]

Plaintiffs also claim that continuation with the Kickapoo project is unlawful under the Flood Control Act of 1962 which initially authorized the project.

Section 201 of that Act provides that "the authorization for any flood control project herein adopted requiring local cooperation shall expire five years from the date on which local interests are notified in writing . . . of the requirements of local cooperation, unless said interests shall within said time furnish assurances satisfactory to the Secretary of the Army that the required cooperation will be furnished." Section 203 authorizes a number of projects, one of which is "[T]he project for the Kickapoo River . . . substantially as recommended by the Chief of Engineers in House Document Numbered 557, Eighty-seventh Congress. . . ." Plaintiffs specifically argue that the failure of the Corps to request and obtain local assurances of participation, in the form of cost-sharing commitments, voids the project and renders it enjoinable under the Administrative Procedure Act as not "in accordance with law" [5 U.S.C. § 706(2)(A)], "in excess of statutory . . . authority" [Section 706(2)(C)], and "without observation of procedure required by law" [Section 706(2)(D)].

During oral arguments this Court raised the question as to whether plaintiffs had standing to raise the issues presented by this claim for relief. Plaintiffs and intervenors were permitted to file supplemental briefs on the standing issue.

Both parties agree that the two-pronged test enunciated by the Supreme Court in Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L. Ed.2d 184 (1970), is controlling:

> The first question is whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise.
>
> \* \* \* \* \* \*
>
> The question of standing . . . concerns . . . the question whether the interest sought to be protected by the complainant is arguably

---

6. Environmental Defense Fund, *supra*, 470 F.2d at 301.

7. *Id.* at 300.

within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. *Id.* at 152–153, 90 S.Ct. at 829–830.

Plaintiffs argue that they satisfy both requirements. They note that their interests are two-fold: some of the individual plaintiffs, and members of the plaintiff associations, canoe on a portion of the Kickapoo River which would be inundated if the proposed project is completed; others own land which will be condemned if the project continues. Thus, they suggest the injury in fact requirement is clearly satisfied. See Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Plaintiffs stress, however, that it is the continuation and completion of the project without obtaining the necessary local assurances which is causing them injury in fact and not the per se failure of the Corps to obtain local assurances as required by statute.

With reference to the zone of interests test, plaintiffs argue that their interests, though reflecting "aesthetic, conservational, and recreational" values,[8] are definitely within the zone of interests to be protected or regulated by the statute in question. In fact, they contend that the regulation of their interests is total since implementation of the project terminates their use of the inundated part of the river and will result in the condemnation of their land.

■■ At a minimum, we cannot accept plaintiffs' analysis of the zone of interests test. While we recognize that "[W]here statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action," [9] we fail to understand how plaintiffs' interests constitute interests protected or regulated by the statutory proviso requiring local assurances of participation for the construction of the downstream levees. The obvious interest

sought to be protected or regulated by the proviso is a Congressional interest in ensuring that local communities who are to receive a direct benefit from the local protection levees, share in the cost of such works. As noted by the intervenors, the interests of neither group of plaintiffs coincide, geographically or otherwise, with the local protection levees and the interest expressed in the statutory proviso. Both the interests of the canoeing plaintiffs and the property-owning plaintiffs arose because of the proposed construction of the dam rather than the downstream local protection levees.

Nor does the fact that plaintiffs have standing to raise the NEPA claims obviate any standing requirement for their "local assurances" claim under § 201 of the Flood Control Act of 1962. Plaintiffs interpret the following statement in Sierra Club v. Morton, *supra,* 405 U. S. at 737, 92 S.Ct. at 1367, as dispensing with the necessity of demonstrating standing as to the additional issue:

> [T]he fact of economic injury is what gives a person standing to seek judicial review under the statute, but once review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate.

Although we believe that plaintiffs are misinterpreting the statement, suffice to say that it is clear that they cannot establish any economic injury attributable to the construction of the local protection levees, with or without the required local assurances. Plaintiffs' injury in fact, like the interests they seek to protect, relates to the construction of the dam and not to the local protection levees.

■ We realize that by our treatment of the standing issue, we have inadvertently decided, adversely to plaintiffs'

8. The interest protected or regulated by the statute "at times, may reflect 'aesthetic, conservational and recreational' as well as

economic values." Data Processing Service, *supra,* 397 U.S. at 154, 90 S.Ct. at 830.

9. *Ibid.*

claim that the failure of the Corps to obtain the local assurances voids the entire project. Indeed, even if we were to assume plaintiffs had standing to assert the claim, we are convinced that the receipt of the local assurances from the communities of Gays Mills and Soldiers Grove to participate in the cost of construction and operation of the local protection levees was not intended by Congress as a condition precedent to the construction of the dam and reservoir.

The judgment of the district court is affirmed.