CONSERVATION COUNCIL OF NORTH CAROLINA, James C. Wallace, Paul E. Fearington and wife, Ruby B. Fearington, Agnes M. Sparrow, and Ecos, Inc., et al., Plaintiffs,

v.

Robert F. FROEHLKE, Secretary of the Army, Lieutenant General Frederick B. Clark, Chief of Engineers, Corps of Engineers of the United States Army, and Colonel Albert Costanzo, Wilmington District Engineer, Corps of Engineers of the United States Army, Defendants,

The City of Fayetteville, a Municipal Corporation and Cumberland County, a political subdivision of the State of North Carolina, Intervenors,

The City of Wilmington, a Municipal Corporation, New Hanover County, Pender County, Columbus County, political subdivisions of the State of North Carolina, and the Lower Cape Fear Water and Sewer Authority, a public instrumentality of the State of North Carolina, Intervenors,

The City of Dunn and the Towns of Erwin and Lillington, Municipal Corporations, and Harnett County, a political subdivision of the State of North Carolina, Intervenors,

The City of Sanford, a Municipal Corporation, Intervenor.

No. C–184–D–71.

United States District Court,
M. D. North Carolina,
Durham Division.

July 28, 1977.

Norman B. Smith, Greensboro, N. C., for plaintiffs.

Office of Counsel, U. S. Army Corps of Engineers, Wilmington, N. C., and N. Carlton Tilley, Jr., U. S. Atty., Greensboro, N. C., for defendants.

Rudolph G. Singleton, Jr., Fayetteville, N. C., for intervenors, City of Fayetteville and Cumberland County.

James C. Fox, Wilmington, N. C., for intervenors, City of Wilmington, etc.

Wiley F. Bowen, Dunn, N. C., for intervenors, City of Dunn et al.

Lowry M. Betts, Sanford, N. C., for intervenor, City of Sanford.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

GORDON, Chief Judge.

This case represents a continuation of a relatively new and growing subject of federal court litigation relating to the effect of man's projects upon his environment. More specifically, this matter is before the Court for review of the Army Corps of Engineer's decision to proceed with the impoundment of the B. Everett Jordan Lake. For the reasons which follow, the Court sustains the Corps' decision to impound the B. Everett Jordan Dam.

### I. PROJECT

The B. Everett Jordan Dam Project lies near the central eastern edge of the North Carolina Piedmont Plateau. The proposed reservoir is to be located at the confluence of the Haw and New Hope Rivers approximately twenty miles south of Chapel Hill, North Carolina, and just northeast of the town of Haywood, North Carolina. The project area includes portions of four central North Carolina counties—Chatham, Durham, Orange, and Wake.

On December 30, 1963, Congress enacted Public Law 88–253 authorizing funds for a multipurpose dam for flood control, water supply, water quality control, general recreation, and fish and wildlife enhancement. Ground-breaking for the actual construction of the dam occurred on December 7, 1970.

The project consists of a 112 foot high, 1,300 foot long earth-fill dam. The proposed impoundment will have a flood-control storage capacity of 183,012 acre-feet with a maximum pool depth at the top of the conservation pool of 58 feet. A multi-level intake tower is located at the upstream face of the dam to control the quality of low flow releases.

The impounded water will cover a surface area of 14,300 acres and will come from two primary sources, the Haw River and the New Hope River. The Haw River is a swiftly moving river with a narrow valley and a steep stream gradient. The New Hope River, the largest tributary of the Haw River, is a slow-moving river with a comparatively wide flood plain and a gentle stream gradient. The New Hope joins the Haw three-tenths of a mile above the dam site. Due to the difference in stream gradients, ninety per cent of the impoundment will be in the New Hope basin, but the water supply will be primarily from the more swiftly flowing Haw River. If filled, the 14,300 acre lake will have a unique circulation pattern which is attributable to the fact that eighty per cent of the average annual flow will come from the Haw River while more than eighty-five per cent of the volume of the lake will be on the New Hope. Consequently, during periods of high flow following heavy rains, water from the Haw River will flow to the New Hope arm of the lake.

The project area includes a total of approximately 47,000 acres of land. As previously stated, some 14,300 acres of that total will comprise the actual lake region created by the impoundment of the B. Everett Jordan Dam. At present, approximately 31,000 acres of the 47,000 acres included in the project area are under lease to the North

Carolina Wildlife Resources Commission for use in the state's game land program pending the ultimate determination of this litigation. After the lake is created, approximately 33,000 acres of the project will remain above water for non-water recreational and conservation uses.

Due to the presence of certain man-made structures in and around the lake, the quality of the water in the lake will be different from one location to the next. Consequently, the lake has been divided into four segments. The first division is between the inundated areas on the Haw River and the New Hope River; that is, Segment I will consist of the area covered by the Haw and New Hope Rivers from the dam to the constriction. The two rivers feeding the reservoir will create two arms within the lake. In addition, two major road crossings on the New Hope arm; namely, Highways 64 and 1008, were constructed with very small openings relative to the length of the crossings. These barriers will restrict the mixing and flow of water in the New Hope arm of the reservoir, thus creating three additional segments within the lake. Segment II encompasses the lake region of the New Hope from the constriction to Highway 64. Segment III lies between Highway 64 and Highway 1008 on the New Hope. Segment IV consists of the remaining inundated region on the New Hope above Highway 1008. Segment II will cover the largest area of land, followed in size by Segments III, IV, and I respectively.

The lake that will be created by the impoundment of the B. Everett Jordan Dam will provide the surrounding area, both above and below the dam site, with the benefits of flood control, water quality control, water supply, fish and wildlife conservation and recreation. Additionally, the remaining approximately 33,000 acres of land in the project will support extensive non-water recreation and wildlife and plant conservation.

## II. HISTORY OF CASE

On August 10, 1971, the Conservation Council of North Carolina (CCNC) brought suit seeking injunctive and declaratory relief against the construction of the New Hope Dam by the United States of America acting through the Army Corps of Engineers. The plaintiff alleged that the dam project did not comply with the requirements of the National Environmental Policy Act of 1969 (NEPA) and requested that the defendants be enjoined from proceeding further with the project. After a hearing on the plaintiff's motion for preliminary relief, the Court denied the motion. This denial of the motion for a preliminary injunction was affirmed by the Fourth Circuit Court of Appeals.

Subsequent to the filing of this action, numerous parties moved for permission to intervene in the action. Among those seeking intervention were the upstream cities of Durham and Chapel Hill, and the downstream city of Fayetteville. The Court allowed the intervention of these and other parties to this action so that their claims might be presented and the matter decided with the benefit of all the information these parties desired to present. Presently, there are motions pending to dismiss Durham and Chapel Hill from this action.

Shortly after the Court's denial of the plaintiff's request for preliminary relief, cross-motions for summary judgment were presented to the Court. The Court granted the defendant's motion and dismissed the case. On appeal, the Fourth Circuit found the basic issue to be "whether the District Court had an obligation to review the merits of a substantive agency decision . . . or whether the Court discharges its proper function by merely determining that the agency has acted in a procedurally correct manner; i. e., on the basis of a reasonably sufficient 'impact' statement." *CCNC v. Froehlke,* 473 F.2d 664 (4th Cir. 1973). The Court of Appeals concluded that the District Court must engage in a substantial inquiry to determine whether there had been a "clear error of judgment." Accordingly, the case was remanded to this Court with directions to consider the merits and review the substantive findings of the agency.

A Pre-trial Order was formulated by the parties to delineate the scope of the trial. However, rather than proceeding to trial, the parties agreed to, and this Court signed, a Consent Judgment on February 5, 1974.

The Consent Judgment, by its explicit language, settled all matters and things in controversy between the parties subject to several very narrow limitations. The Judgment eliminated the controversy over the actual construction of the dam facility. Consequently, the defendant proceeded to complete, and did in fact complete, the construction of the B. Everett Jordan Dam. However, the Judgment prohibited the clearing of the reservoir site for the creation of the lake. The creation of the conservation pool was prohibited limited only by the necessary backing-up of waters for flood protection needs. Additional water quality analysis was suggested for water quality criteria, together with continued monitoring of solids and nutrients moving on the stream beds below the water column in flood loads, and with monitoring of heavy metal concentrations in fish life. Other additional studies were prescribed for evaluation of the project's effect on forests, and other plant life, fish, birds, mammals, mosquitoes, silt deposits and sediments, above and below the dam.

The data collected was to be contained in a draft of the supplement to the final environmental impact statement and filed with the Council on Environmental Quality. A forty-five day review and comment period after publication was required.

The Judgment provided, that at any time after compliance with the provisions of the Judgment, that the defendants could file notice of their decision to create the B. Everett Jordan Lake (permanent conservation pool). Any party opposing this decision was required to file a response within thirty days or be forever barred by the Judgment. The Consent Judgment provided that the opposition must state specifically the factual and legal grounds for their objection and placed the burden on them to show that the defendant's decision to impound was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

On September 15, 1976, after compliance with all the terms and conditions of the Consent Judgment, the District Engineer for the Wilmington District, U. S. Army Corps of Engineers published a "Notice of Decision to Impound." In a thorough and comprehensive manner, Colonel Homer Johnstone, the District Engineer, balanced the benefits and detriments of the proposed impoundment and concluded that the closure of the gates and impoundment of the waters would best serve the public interest.

On October 12, 1976, the Conservation Council of North Carolina filed its response to the defendant's "Notice of Decision to Impound" the B. Everett Jordan Dam. According to the terms of the Consent Judgment, the CCNC set forth their specific objections to the Army's decision. In general, CCNC contends that the defendant's decision to impound the waters was not based on a consideration of environmental factors, and further, was arbitrary and capricious and a clear error in judgment. In support of this contention, CCNC points to specific areas within the defendant's supplemental studies, which CCNC contends, clearly indicates that the lake will be unsuitable for water supply, recreation or fishing. Accordingly, CCNC insists that any decision to impound should be overruled by the Court. CCNC asserts that it is not opposed to impoundment at any time, only, that such a decision should await the results of additional studies, which CCNC contends are necessary, to establish that the lake will definitely support a suitable water supply, recreation, and fishing habitat.

CCNC's specific objections will be discussed later in detail, however, their general objection may be characterized as centering on the quality of the water to be contained in the proposed impoundment.

On October 14, 1976, the intervening plaintiff, the City of Durham, filed its response to the Corps' decision. Durham asserts that it does not oppose the creation of a clean lake. However, Durham contends that the evidence clearly establishes that the proposed lake is likely to be a shallow,

motionless body of water unsuitable for its intended uses. More specifically, Durham contends that it will have to incur substantial expenses to provide additional waste-water treatment for the water it discharges into the streams feeding the lake from its waste-treatment plants. Durham states that this additional treatment will be required solely because of the presence of the lake. Accordingly, Durham contends that this increased cost should have been considered in the cost/benefit ratio, and, apparently, that this fact was not considered by the Army in its decision. Consequently, Durham contends that this increased cost is a factor the Army should have considered, and further, that this cost should be borne by the United States.

On October 15, 1976, the intervening plaintiff, the town of Chapel Hill, filed its response to the decision to create the B. Everett Jordan Lake. Chapel Hill's objections cover the same areas mentioned in the responses of CCNC and Durham. Chapel Hill's specific objection is directed at the alleged additional expense it may incur for the removal of phosphorus from its waste-water effluent.

By way of summary, the plaintiffs' objections center on two propositions: (1) that the quality of the water in the proposed lake will be unsuitable for its intended use, and (2) that the Army failed to consider the alleged cost to Durham and Chapel Hill for the removal of phosphorus from its waste treatment effluent.

On November 1, 1976, the parties signed, and the Court approved a Final Pre-trial Order designating the scope of the review hearing to be held in this matter.

## III. PARTIES AND ISSUES

The parties are in agreement that the contested issue to be tried by the Court is as follows: Whether the decision of the defendant to impound water and create the permanent B. Everett Jordan Lake was arbitrary, capricious, abusive of agency discretion, or otherwise not in accordance with law.

Inasmuch as this controversy was settled by the entry of a Consent Judgment subject to being re-opened by the filing of objection to the defendant's "Notice of Decision to Impound," the only parties before the Court in this action and contesting the Corps' action are those that have filed objections to the Corps' decision. As to those parties not filing a response to the Army's decision, this action is closed. Accordingly, the only party plaintiffs remaining in this action are the Conservation Council of North Carolina, the City of Durham, North Carolina, and the Town of Chapel Hill, North Carolina.

The contentions presented by the parties as they relate to the issue before the Court will be discussed below. As to those issues the Court will make additional findings of fact. However, before proceeding to the merits of the case, the Court should first specify its role, function, and authority in this case.

## IV. SCOPE OF REVIEW

The unequivocal intent of NEPA is to require agencies to consider and give effect to the environmental goals set forth in the Act, not just to file detailed impact studies which will fill governmental archives and add weight to the Court's file in this case. *Environmental Defense Fund v. Corps of Engineers of the United States,* 470 F.2d 289 (8th Cir. 1972). To this end, the Court is required to conduct a substantial inquiry to determine whether the agency acted within the scope of its authority and whether its decision was within the range of choices available. Accordingly, the Court is required to find that the actual choice made by the agency was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and that the agency followed the necessary procedural requirements. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

In *Coalition for Responsible Regional Development v. Coleman,* No. 76–1400 (4th Cir. April 11, 1977), 555 F.2d 398 (4th Cir. 1977), the Fourth Circuit addressed the scope of the substantial inquiry which the

District Court must engage in in evaluating the propriety of agency action in environmental cases. Although arising under § 4(f) of the Transportation Act, the Court stated that the standard for judicial review of an administrative decision is the same whether arising under NEPA or the Transportation Act. *Coleman, supra.*

■ The test is two-prong: First, the Court is to consider whether the agency acted within the scope of its authority (the parties all agree that the Corps' action was within the scope of its authority and in conformity with all procedural requirements), and secondly, to determine whether the ultimate decision (impoundment) was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Overton Park, supra; Coleman, supra.* In applying the arbitrary standard, the Court must engage in a substantial inquiry in order to determine whether the agency, in its conclusions, made a good faith judgment after considering all relevant factors, including possible alternatives or mitigative measures.

In passing on the "good faith" aspect of an administrative judgment, the Court is specifically not empowered to substitute its judgment for that of the agency. *Overton Park, supra* 401 U.S. at 415, 416, 91 S.Ct. 814; *Coleman, supra.* Accordingly, the Court is not to make the ultimate decision but only to see that the official or agency took a "hard look" at all relevant factors. Consequently, the power of judicial review in this area is a narrow one to be applied within reason, and in essence is confined to a determination of whether the administrative decision represented a clear error of judgment. *Environmental Defense Fund, supra,* at 300; *Coleman, supra.*

■ In determining whether the agency decision represented a clear error of judgment the Court is not to be led into construing the mandating statutes in NEPA as a device to be used as a crutch for chronic faultfinding and, it is not to fault the agency for failure to consider "an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative." *Coleman, supra.* The agency is only required to set forth those alternatives sufficiently to permit a reasoned choice. *Brooks v. Coleman,* 518 F.2d 17, 19 (9th Cir. 1975).

■ The agency decision must be based upon a consideration of relevant environmental factors and public policy. Consideration of irrelevant factors with disregard or indifference to relevant factors opposing the decision is strong evidence of a clearly erroneous decision made in bad faith. In sum, so long as the Court, in its review, observes the rule of reason and practicality and takes a "hard look" at the relevant factors, it performs its obligation under the Act. *Coleman, supra.*

The Court concludes that its role under NEPA is not only to see that the government agency had complied with all the procedural requirements, but also to engage in a substantial inquiry to determine whether there has been a clear error of judgment. It is absolutely essential that the Court not substitute its own subjective judgment for that of the agency, for Congress has given that authority to the agency. Rather, the object of the inquiry is to enable the Court to make its own determination of whether the agency's decision was arbitrary and capricious when viewed in terms of the data, information, and evidence supplied and set forth in the EIS and at trial.

With the scope of this inquiry sufficiently stated, the Court now makes findings of fact as follows:

## V. FINDINGS OF FACT ON THE NARROWED ISSUES

After a thorough examination of the proposed findings of fact submitted by the parties to the Court, the Court concludes that it is appropriate to adopt portions of the defendant's findings in their entirety. The Court believes that some brief explanation is in order explaining why it has adopted the defendant's method of presenting the facts in this case.

The plaintiffs' proposed findings of fact incorporate much of the data set forth in

the various environmental impact statements and exhibits before the Court. On the other hand, the defendant's findings of fact set forth the data described in the various records in summary form and concentrate on the evidence from the experts as to the conclusions to be drawn from those facts. Inasmuch as the parties are not in any substantial disagreement over the type of testing performed, the manner the tests were conducted, or the sufficiency of the data collected from those tests, and further, the fact that all of the tests and data accumulated therefrom appears fully in the EIS and exhibits to the Court, it is concluded that a restatement of those facts is unnecessary. The task before the Court is to determine whether the Corps fully considered all the data collected from the tests and considered all other relevant data before it. With the few exceptions, which will be discussed later, the plaintiff does not contest the sufficiency of the tests performed or the data collected. Accordingly, the Court concludes that it is appropriate to present findings of fact in the manner suggested by the defendant.

The following findings of fact are supplemental to those previously set forth in the opinion of the Court.

## FINDINGS OF FACT

1. The Court has jurisdiction over the parties and subject matter.

2. The streams and rivers in question in this litigation are either navigable rivers or source-tributaries to a navigable stream.

3. There is no existing order to Durham or Chapel Hill to modify their waste-treatment facilities.

4. The U. S. Army Corps of Engineers, through its District Engineer, filed on September 15, 1976, its Notice of Decision to go forward with impoundment of the B. Everett Jordan Lake.

5. This Notice of Decision summarized the District Engineer's reasons and analysis in his decision to go forward with the impoundment.

6. The U. S. Army Corps of Engineers, through its District Engineer, Colonel Homer Johnstone, carried out a full and proper decisionmaking process which involved a multitude of disciplines both within the Corps and through outside consultants.

7. The District Engineer consulted with experts in a wide range of disciplines before reaching his decision.

8. The U. S. Army Corps of Engineers, through its District Engineer, Colonel Homer Johnstone, carried out its procedural responsibilities both under NEPA and under the Consent Judgment of February, 1974.

9. The Corps of Engineers prepared and circulated a technical work plan (inviting comments from the plaintiffs) and the plaintiffs have no quarrel with the manner in which the Corps conducted additional studies.

10. The prediction of the trophic state of a proposed impoundment is a nascent science calling for a great deal of judgment. Various mathematical models are used but these are imperfect. The models used are the best available from the EPA National Eutrophication Survey. Care must be taken in interpreting the output for various parts of the country. Allowances must be made for various climatic, geological, and topographical factors; also water residence time and turbidity.

11. Before making any predictions as to water quality or environmental effect, the Corps of Engineers first set out under the terms of the Consent Judgment of February 5, 1974, to collect further data in both the Haw and New Hope River basins. This data was in addition to that which had been collected by the Corps and its water quality contractors from 1966 through 1974.

12. In conducting their studies as to water quality, the Corps of Engineers tested a wide range of parameters including:

| | | |
|---|---|---|
| Temperature | Nitrogen | Mercury |
| Residue | Phosphorous | Chromium |
| Turbidity | Chlorophyll | Cadmium |
| Conductivity | Coliforms | Enterocci |
| pH | Chloride | Iron |
| Dissolved oxygen | Manganese | Copper |
| Biochemical oxygen demand | Zinc | Lead |

13. The Corps of Engineers has carried out sufficient studies as to water quality both in-house and through independent contractors and these studies and data collection have been done by standard, scientifically accepted methods.

14. Contemporaneous with the above data collection, the Corps of Engineers prepared and tested a physical model of the proposed impoundment at their Waterways Experiment Station in Vicksburg, Mississippi. Members of the Wilmington District staff observed the testing at Vicksburg and, later, conducted further tests at Wilmington.

15. The Corps of Engineers maintains regular sampling and testing of a wide range of water quality parameters at its reservoirs.

16. The operation of the physical model, when analyzed with data from the operation by the Corps of John H. Kerr (Buggs Island) Lake, shows that Jordan will be divided into four physical segments and that this segmentation of the Jordan Lake will affect water quality.

17. Studies conducted by Dr. Weiss show that segmentation of lakes by barriers, such as causeway bridges, limits water exchange between the segments and thus increases retention of phosphorus.

18. One of the most important factors in predicting trophic state in the Piedmont Southeast is the presence of iron and aluminum rich clays because the iron and aluminum molecules bind with the phosphorus and thus "trap" the phosphorus out of the lake. This gives lakes in the Piedmont Southeast a high coefficient of phosphorus retention and makes lakes less· eutrophic despite high nutrient loadings.

19. The Kirchner-Dillon values for phosphorus retention, which were used by Hydrocomp and the Corps in predicting the degree of eutrophication in the Vollenweider and Larsen-Merceir models overstate eutrophication because the value system was developed for use on Canadian lakes and the values must be subjectively adjusted to account for differences in soils, climate, and topography.

20. The usefulness of a particular trophic state of a lake is itself subjective and somewhat a matter of personal taste or desires. For instance, very clear (nutrient poor) water may be more aesthetically pleasing than eutrophic (nutrient rich) water but would not support a good fishery. The converse would be true of a heavily eutrophic lake.

21. In assessing the predicted trophic state of the proposed impoundment as a factor in his decisionmaking, the District Engineer relied not only upon the in-house scientists of the Corps of Engineers but also upon two outside experts, Dr. Patrick Brezonik of the University of Florida and Dr. Charles Weiss of the University of North Carolina at Chapel Hill.

22. Both Dr. Weiss, an expert in the fields of limnology and bacteriology, and Dr. Brezonik, an expert in limnology and water chemistry, testified that they were in substantial agreement with the water quality conclusions reached by the District Engineer.

23. The consensus conclusion of the Government experts, Brezonik, Weiss, and Jackson, was that the probable water quality of the impoundment was such that the project purposes would be fully carried out. They predicted that Segments I, II, and III would be available for swimming, boating, fishing, and water supply and that Segment IV could be used for boating and fishing. This analysis formed the basis for the water quality conclusions stated by. the District Engineer in his Notice of Decision.

24. The plaintiffs' pleadings raised questions as to the potential presence in the water of kepone, mirex, and polychlorinated biphenyls (PCB's), but they presented no evidence on these allegations; and the Government witness, Correale, stated defi-

nitely that testing for kepone, mirex, and "PCB's" had been conducted and that no amounts of any consequence were found.

25. When testing done by the Corps of Engineers indicated that some fish ·in the streams contained mercury above the FDA proposed guideline, the District Engineer contacted the State of North Carolina to ascertain the position of the State and readings on other river basins.

26. There is considerable controversy as to the proposed FDA guideline on mercury and the State of North Carolina takes a position that the guideline is too stringent as there appears to be a high background level of mercury in North Carolina.

27. The testing for mercury in fish flesh did on a number of occasions exceed the proposed guideline of the Food and Drug Administration, but according to the only toxicologist to testify, there is no threat to human health from the presence of the mercury in the fish at those amounts or frequencies.

28. There is no presently ascertainable threat to human health from the presence of heavy metals in the waters in the frequencies and amounts which were recorded.

29. Mercury occurs in many compounds in the environment, stemming both from manmade sources and natural sources. For purposes of assessing the environmental impact of the impoundment, the Corps of Engineers assumed that all of the mercury found was in the more dangerous methyl mercury form. This is a very conservative toxicological position.

30. There would be no presently ascertainable bacteriological threat to human health by impoundment of the reservoir.

31. The Corps of Engineers carries out regular mosquito abatement programs at all of its reservoirs and will institute one at Jordan if impoundment takes place.

32. Impoundment and storage would be necessary to provide downstream communities with low flow augmentation for a steady river flow. Such a steady river flow will benefit downstream communities and will assure them of a steady water supply both in terms of quality and quantity.

33. There is a critical need for more water supply storage in Piedmont North Carolina, and the B. Everett Jordan project would provide such a supply for the "Triangle Area."

34. Taste and odor problems which might result from use of the lake for raw water supply would be no different from that experienced by many water treatment plants in North Carolina and would fall within the range which can be treated economically by conventional means.

35. Although a so-called "dry reservoir" could be used for hunting, fishing, hiking, and camping, the daily usage for recreational purposes would be miniscule compared to that of the reservoir impoundment as planned.

36. The U. S. Army Corps of Engineers, through its District Engineer, Colonel Homer Johnstone, circulated its Draft Supplement to the EIS to the plaintiffs and the plaintiffs, CCNC and ECOS, responded and these comments were printed in the final supplement. In some instances, the Corps made modifications in their studies, calculations and/or plans in response to these comments.

37. The District Engineer considered the available alternatives to impoundment prior to his decision including the two predominant alternatives, "dry reservoir," and "delay."

38. There are adverse environmental consequences from continuing the project in its current unimpounded status, especially in sedimentation and the decline of some vegetation.

39. Although the plaintiffs' experts have differing conclusions from the defendants' experts, it appears that the reservoir, if impounded, would have a quality sufficient to allow its use for the Congressionally authorized purposes.

40. There is common agreement that B. Everett Jordan will be eutrophic, but over 70 per cent of the lakes in North Carolina are eutrophic, including the highly popular

John H. Kerr (Buggs Island) Reservoir, Hickory Lake, High Rock Lake, Lake James, and Lake Norman.

41. It is common, safe, and practical in North Carolina for a municipal water system to take its supply of water out of a river or body of water into which other municipalities have induced waste sewage. Raleigh, Rocky Mount, Salisbury, and Albemarle, for example, are cities supplied by water into which waste has been discharged.

42. The District Engineer consulted many different experts before reaching his Decision to Impound, including limnologists, bacteriologists, chemists, environmental engineers, botanists, foresters, toxicologists and others.

43. Segment IV of the proposed Jordan Lake can be compared for water quality purposes to that section of Nutbush Creek Arm of Kerr Lake (Buggs Island) above the State Road 1308 bridge and causeway. This is a very useful arm of Kerr Lake despite the presence of effluent from the waste water treatment plant of the City of Henderson.

44. The judgment of the Corps of Engineers as to the projected water quality of the B. Everett Jordan Lake has been based upon recent field data gathered expressly for the supplemental studies, water sampling data which has been collected on a regular basis since 1966, mathematical and physical models, previous studies and projections, and the judgment of outstanding professionals in water resources study disciplines.

## VI. CLAIMS OF DURHAM AND CHAPEL HILL

Durham and Chapel Hill have presented similar claims in this litigation for determination by the Court. In general, Durham and Chapel Hill contend that they are entitled to compensation from the United States for any increase in the cost of sewage treatment due to the impoundment of the B. Everett Jordan Dam. In addition to the claim for compensation, Durham and Chapel Hill contend that the Corps failed to

satisfy the requirements of NEPA by failing to take into consideration the cost of improving the sewage treatment facilities to the upstream communities as a result of the Jordan Lake.

### A. Claim for compensation

Durham and Chapel Hill presently make use of a sewer system that is an operation conceived to take advantage of the use of the flow of a tributary of a navigable stream. The system, although providing some degree of treatment to this discharge, relies on the flow of the discharge streams to complete the task of sewage treatment. Plaintiff-Intervenors strenuously contend that the impoundment of the Jordan Dam will result in more stringent pollution control limits being imposed on them. This increased cost, as their argument goes, will result from the alleged fact that the reservoir will reduce the flow of the sewage-receiving streams, thus reducing the streams capacity to assimilate phosphorus and other detrimental materials in their plant effluent.

Accordingly, this case does not involve a taking of fast land or vested easements, rather, the issue involved is whether the cities have a property right in the continued and unaltered flow of a tributary to a navigable stream. If this issue is answered in the affirmative, the Fifth Amendment would obviously require the payment of just compensation. If answered in the negative, no compensation will be required.

For purposes of this discussion, it will be assumed that the cities will indeed be required to expend additional money on their treatment facilities as a consequence of the impoundment of the Jordan Dam. However, the Court expressly finds that Durham and Chapel Hill have failed to establish that such expenditures will be necessary, or if necessary at some future date, are a consequence of the proposed impoundment. Accordingly, with respect to the issue of compensation, the Court will address the defendant's motion to dismiss for failure to state a claim for relief. For the

reasons which follow, as to the issue of compensation, the motion is allowed.

The B. Everett Jordan Dam is constructed at the confluence of the Haw and New Hope Rivers. The Haw and New Hope are tributaries of the navigable waterway of the Cape Fear River. The proposed dam project is a part of a multi-purpose project including flood control for the Cape Fear River Basin.

The parties do not appear to contest the proposition that the tributaries in question are indeed tributaries to a navigable stream. However, the plaintiff-intervenors do allege that the impounding of the rivers will cause them to cease to be part of a navigable river. The Court concludes that this argument is without merit. Congress has the power under the Commerce Clause to erect dams for flood control in order to protect the navigable streams of commerce. *United States v. Grand River Dam Auth.,* 363 U.S. 229, 232, 80 S.Ct. 1134, 4 L.Ed.2d 1186 (1960); *Oklahoma v. Atkinson Co.,* 313 U.S. 508, 525, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941); *United States v. Appalachian Power Co.,* 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940). Accordingly, the issue for determination is whether the plaintiff-intervenors have a legally protected property right in the continued flow of these tributaries which is superior to the government's navigable servitude on these streams.

The government, by the creation of the Jordan Lake, has not diminished the value or use of the plaintiff-intervenors' land. All that may result from the impoundment is an alteration of the flow capacity of the streams—a necessary result from any impoundment. Accordingly, what the plaintiff-intervenors' claim is a right in the continued flow of a stream.

■ The Court concludes that the flow of a stream is in no sense a private property right, and that there is no room for a judicial review of that question. *United States v. Chandler-Dunbar Co.,* 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913). There is no private property right in the flow of a stream which is subject to the United States navigational servitude. *United*

*States v. Appalachian Power Co., supra* 311 U.S. at 427, 61 S.Ct. 291. This rule of law has existed for too long a period of time to be disturbed by this Court.

In *United States v. Willow River Power Co.,* 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945), a government dam project resulted in an elevation of the level of the water thus reducing Willow's power generating capacity. The Supreme Court held that this damage to the power company did not constitute such a taking of property as is required by the Fifth Amendment to be compensated. *Willow, supra* at 510, 65 S.Ct. 761. The Court stated the matter very succinctly when it observed:

"Rights, property or otherwise, which are absolute against all the world are certainly rare, and water rights are not among them. Whatever rights may be as between equals such as riparian owners, they are not the measure of riparian rights on a navigable stream relative to the function of the Government in improving navigation. Where these interests conflict they are not to be reconciled as between equals, but the private interest must give way to a superior right, or perhaps it would be more accurate to say that as against the Government such private interest is not a right at all." *Willow, supra* at 510, 65 S.Ct. at 767.

The power of Congress, when appropriately exercised, is not to be questioned by the courts. As stated in *Grand River,* "[W]hen the United States appropriates the flow either of a navigable or nonnavigable stream pursuant to its superior power under the Commerce Clause it is exercising established prerogatives and is beholden to no one." *Grand River, supra* at 233, 80 S.Ct. at 1137.

In *United States v. Rands,* 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967), the Supreme Court held that the value of land as a portsite was not a proper element of compensation. In *Rands,* the Court observed that the power to regulate navigation conferred upon the United States a dominant servitude which extended to the

entire stream. The proper exercise of the power is not an invasion of any private property right in the stream, for the damage sustained does not result from the taking of property from the riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interest of riparian owners have always been subject. *Rands, supra* at 123, 88 S.Ct. 265. Accordingly, a riparian owner is not entitled to compensation for diminished value which is attributable to the flow of the stream. *United States v. Virginia Electric Co.,* 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961).

The Fourth Circuit has previously addressed the issue of whether a riparian owner has a right to compensation for loss of waste-disposal use of nonnavigable source-tributary of navigable rivers. The Court, in characterizing the petitioners complaint stated, "[p]lainly this is not a problem of flow, but rather of what ingredients can be put in the water. Stevens' difficulty is the prohibition against pouring a deleterious additive into the creek or river. We see no merit in this plaint." *United States v. 531.13 Acres of Land,* 366 F.2d 915, 919 (4th Cir. 1966).

In *513.13 Acres,* an industrial polluter was faced with a problem even more serious than plaintiff-intervenors' alleged difficulty. In that case, a dam was built and the state ordered the polluter to clean up its discharge. Prior to the impoundment, Stevens was free to dump its refuse at will. After impoundment, in an effort to improve the quality of the water for contact uses, Stevens was ordered to clean up its discharge. The Court stated, that even if the Government had ordered Stevens to cease its dumping activities rather than the state, that Stevens' position would still be untenable because the Government in so doing would have taken nothing which belonged to Stevens. Additionally, the dam had not only limited the use of Stevens' discharge process, it had destroyed it and still no taking was found by the Court. Accordingly, the Court held that the cost of a satisfactory alternate method of treatment must be borne by Stevens, and could not be shifted to the United States.

In *Borough of Ford City v. United States,* 345 F.2d 645 (3rd Cir. 1965), the court passed on the issue of whether a municipality has a claim for compensation due to alleged damage to its sewer system claimed to have been due to the construction of a lock and dam by the Department of the Army. In that case the dam resulted in an elevation of the water level causing serious damage to the sewer-outlet systems. The court held that the government was not liable for damage to the system caused by the construction of a lock and dam on the river.

■ What is presented to the Court in this issue is fairly and plainly a sewer system that is a riparian location unit. Its operation and function is conceived to take advantage of the use of the flow of a source-tributary of a navigable stream. Inasmuch as the plaintiff-intervenors have failed to establish private property right in the unaltered flow of the streams in question over and above that of the United States, it is concluded that the plaintiff-intervenors' claim for compensation for this alleged damage is hereby dismissed.

## B. Claim of NEPA Violation

The Court's disposition of Durham and Chapel Hill's claim for compensation does not resolve the critical question of whether the defendant has failed to satisfy the requirements of NEPA for failing to take into account all the economic burdens that may be imposed upon the surrounding area as a necessary consequence of the impoundment of the Jordan Dam. In particular, Durham and Chapel Hill claim that the impoundment of the Jordan Dam will convert the present free-flowing character of the receiving streams into which treated effluent is discharged from a portion of the Durham waste-water treatment plant into a motionless, shallow body of water requiring the City to incur substantial additional expense for the treatment of the waste-water to remove phosphorus and nitrogen. Durham contends that this cost will result

solely from the creation of the lake and, as such, should have been considered by the Corps of Engineers in the cost/benefit ratio. Durham asserts that the Corps should be required to include and describe this financial burden as a part of the cost of the project, and further, that such omission renders the decision to impound unreasonable and arbitrary.

Chapel Hill contends that it is willing to bear the cost of treatment to meet environmental standards, however, Chapel Hill asserts that the EIS indicates that this would have little effect on the water quality in the lake. Accordingly, Chapel Hill contends that the lake will present a public nuisance and health hazard to the citizens of its community and that the cost of additional treatment should be charged as a cost of the project.

The Army Corps of Engineers contend that the cost/benefit ratios and financial burdens asserted by the plaintiff-intervenors are irrelevant inasmuch as their decision to impound was based upon the existing condition of the water and not upon an assumption that additional treatment would be required. Furthermore, the defendant contends that any additional treatment the plaintiff-intervenors may have to implement will result from the mandates of the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1251, et seq., and not as a result of the proposed impoundment. Additionally, the defendant asserts that there is no existing order to Durham and Chapel Hill requiring additional water treatment, and further, that there is no way to evaluate what may or may not be required of them in the future. Accordingly, the defendant contends that it was not required to take into consideration a fact which is based upon mere speculation and further, that in any event, the plaintiff-intervenors have no right to pollute a stream or to expect that any such existing right will continue into the future.

For purposes of this discussion, all questions relating to the water quality in the proposed impoundment will be deferred for evaluation in Part VII of the Court's opinion. Presently, the Court will make a determination of whether the defendant was required to take into consideration the alleged additional cost to Durham and Chapel Hill for improved waste treatment in its ultimate decision to impound, and, whether such data should have been included in the Environmental Impact Statement. For the reasons which follow, the Court concludes that the Corps was not in error for refusing to consider this purely speculative impact of impoundment on the upstream communities of Durham and Chapel Hill.

The purpose of our national environmental policy is set forth in Title 42, section 4321 which states, in part, that it is a national policy to " . . . encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man . . .." This general and laudatory policy is supplemented by six specific goals that place a continuing responsibility on the federal government to use all practicable means, consistent with other essential considerations to improve and coordinate federal plans, functions, programs, and resources to the end that the Nation may: (1) fulfill the responsibility of each generation as trustee of the environment for succeeding generations, (2) assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings, (3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences, (4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice, (5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities, and (6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources. 42 U.S.C. § 4331(b).

It is in this spirit of environmental consciousness that Congress saw fit to require federal agencies, which contemplated construction of man-made structures upon our environment, to prepare and distribute a comprehensive study of the proposed project's effect on the overall quality of man's environment. To this end, 42 U.S.C. § 4332 set forth the framework for the compilation of the necessary data to allow an informed decision to be made on all projects effecting our environment. The framework thus established, has given rise to the Environmental Impact Statement (EIS).

█ The purpose of a full disclosure statement is to allow the federal agency to demonstrate objectivity in the treatment and consideration of the environmental consequences of a particular project. Accordingly, the EIS must be sufficiently detailed to allow a responsible executive to arrive at a reasonably accurate decision regarding the environmental benefits and detriments to be expected from the program's implementation. Put another way, the EIS must provide a record upon which a decisionmaker could arrive at an informed decision. *Sierra Club v. Froehlke,* 486 F.2d 946, 950 (7th Cir. 1973).

NEPA requires a full disclosure of all the factors which are relevant to the ultimate decision of whether or not to go forward with the project. Factors other than environmental considerations are required by the Act to be included in the decisionmaking process. Title 42, § 4332(B) expressly provides that presently unquantified environmental amenities and values are to be given consideration along with economic and technical considerations.

█ Clearly, the plaintiff-intervenors have standing to maintain their claims in the present action. They have alleged facts which fulfill the two-part test of injury in fact and being arguably within the zone of interest to be protected by the statute. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Moreover, the facts as alleged indicate that the plaintiff-

intervenors stand to be among those likely to be injured. *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir. 1975), the court examined the question of a party's standing in environmental cases. In *Davis,* a California city brought an action against the Secretary of Transportation and others for an injunction against the construction of a proposed freeway interchange. The trial court dismissed the plaintiff for lack of standing. The Court of Appeals reversed finding that a city that had alleged that the proposed interchange might adversely affect the quality and quantity of the city's water supply had met the "injury in fact" test for standing under NEPA. *Davis, supra* at 671.

In the present case, Durham and Chapel Hill have alleged that they will be forced to incur an expense solely from the impoundment of the Jordan Dam. Accordingly, they have met the injury in fact test as set forth in the *Data Processing* decision. Moreover, they clearly fall within the group of those being arguably within the zone of protection set forth in NEPA.

Having established that Durham and Chapel Hill have standing to maintain this action does not answer the issues presented in their claim. For a a claim may be totally without merit yet still be sufficient to establish standing. Therefore, it is now necessary to determine whether the Corps has violated some provision of NEPA which has caused the claimed injury to Durham and Chapel Hill.

█ Although there appears to be little authority on the topic, it appears that the Corps is required to take into consideration, under the NEPA standard of determining cost, any money which a municipality will be required to expend *solely* as a consequence of the proposed impoundment. *Cape Henry Bird Club v. Laird,* 359 F.Supp. 404, 416 (1973), aff'd, 484 F.2d 453 (4th Cir. 1973). It would seem to follow from the conclusion that such expenditures must be included as a cost of the project, that such cost to the cities must also be taken into

consideration in the Army's decision to impound. If such costs are determined to exist, then this fact should be set out in the EIS and considered by the agency in arriving at its decision.

If Durham and Chapel Hill are required to expend the substantial sums of money they contend will be necessary due to the impoundment then clearly this factor would be relevant to the Army's decision. However, if the expenditures of this money results from factors other than the project, then it would not be a cost which NEPA requires the Army to consider in making its decision. Accordingly, the Court is presented with a factual question of whether Durham and Chapel Hill will be required to upgrade their treatment plants solely as a consequence of the impoundment of the Jordan Dam.

■ On this issue, the burden of proof is upon Durham and Chapel Hill to establish by a preponderance of the evidence that they will have to incur these expenses solely as a result of the impoundment of the dam. Put another way, since the plaintiff-intervenors are attacking the sufficiency of the EIS and the conclusions reached therefrom, the burden is upon them to establish that the EIS was inadequate and that the decision to proceed was arbitrary and capricious. *Sierra Club v. Froehlke,* 534 F.2d 1289 (8th Cir. 1976). The plaintiffs' burden is not met by merely establishing a prima facie showing of deficiencies. *Sierra Club v. Morton,* 510 F.2d 813, 818 (5th Cir. 1975). Moreover, something more than hindsight and sophisticated editing is required to make out a case. *Sierra Club v. Morton, supra.*

In the present case, Durham and Chapel Hill have presented evidence bearing on the cost of improving their facilities to eliminate certain materials from their waste discharge. However, the issue at this stage is not how much it will cost, but rather, whether there will be a cost incurred, and whether that cost is directly related to the impoundment of the Jordan Dam.

■ Initially, the Court observes that the Corps' decision to proceed with the impoundment was based upon the existing quality of the water in the source streams and not upon the quality of the water after any new treatment facilities are provided. Moreover, at present there is no pending order for Durham and Chapel Hill to alter their present form of waste-treatment. Mindful of these facts, the Court must not overlook the rule that the sufficiency of an EIS must be determined without reference to *possible* future actions. *Sierra Club v. Morton, supra* at 824. Today's statement is based upon existing conditions and the assumption that these conditions will continue into the future.

■ The plaintiffs' fear of increased cost is based in part, if not in its entirety, on a statement which appears in House Document 508, in which a statement appears indicating that a higher degree of treatment of waste may become necessary due to the proposed uses for. the Jordan Lake. From this general statement, the plaintiffs have sought to establish that phosphorus, which is presently discharged into source streams, will be reclassified as a pollutant in the reservoir. Following this conclusion, they point to the requirements of the Federal Water Pollution Control Act of 1972 which requires a complete clean up of the nation's waterways by 1985. Accordingly, their position consists of the following argument: (1) that phosphorus is not a pollutant in the streams, (2) that it is a pollutant in an impoundment, (3) that the Water Act requires removal of all pollutants by 1985, and (4) that from these "facts" it is obvious that they will have to incur an expense solely because of the impoundment of the Jordan Dam.

The Court concludes that Durham and Chapel Hill have failed to prove the case which they have presented to the Court. First, the evidence is conflicting on whether phosphorus is a pollutant in a reservoir and not in a stream; second, the Water Act does not require the removal of all materials present in waste effluent; and finally, there is no evidence which clearly indicates that phosphorus removal will be required

now or in the future. Without doubt, Durham and Chapel Hill could, at any time in the future, be required to alter some portion of their waste-treatment facilities to stay in line with new water quality standards, however, when that will occur, why it will occur, or what will have to be done is left to pure speculation.

The Corps is not required to consider, in detail, every conceivable variation and alternative presented to them, nor are they required to consider an effect which cannot be reasonably ascertained, and whose implementation is remote or speculative. *Coalition for Responsible Regional Development, supra.* For the Court to declare that the EIS is insufficient upon the basis of speculation and conjecture would represent a violation of reason and amount to little more than a "crutch for chronic fault-finding." If the Court were to follow the course presented by the plaintiff-intervenors, this litigation might never come to an end and valuable federal projects which have been authorized by the Congress would never be able to become a reality.

The plaintiff-intervenors simply have not carried their burden of proof. They have raised questions which are of substantial concern to them, but due to the insufficiency of data and proof do not invalidate the decision of the Corps or the sufficiency of the EIS.

Accordingly, the Court concludes that the plaintiff-intervenors' claim, as it relates to the sufficiency of the EIS, is without merit and must be dismissed.

## VII. WATER QUALITY

All of the party plaintiffs remaining in this action contest the Corps' decision to impound upon the basis that the quality of the water in the proposed impoundment will be unsuitable for any of its intended uses. It is now the duty of the Court to evaluate the merits of the Corps' decision to impound in light of these objections. The Court's review of the Corps' decision to impound the B. Everett Jordan Dam is narrowly limited to a determination of whether the Corps' actual decision was arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law. *Overton Park, supra.*

With few exceptions, which have been discussed above or to be covered later, the plaintiffs do not contest the sufficiency of the actual tests that were performed or the accuracy of the data collected therefrom. The plaintiffs' primary objection to the Corps' action rests in the conclusions that the Corps has reached from the available information. In general, the Corps' conclusions were set forth in its twenty-five page Notice of Decision to Impound. In that document, Colonel Johnstone set forth his reasons why impoundment would further the public interest. His conclusions were reached after a thorough review of all the available data and after consultations with noted experts in the field of water quality. From this review, he concluded that the lake would provide an adequate source of water supply, fish and wildlife conservation, contact recreation, flood control and low flow augmentation. The plaintiffs' objections are directed at these conclusions. In general, the plaintiffs contend that the water quality will be so poor that the lake will not be suitable for water supply, fish or wildlife conservation and contact sports. Additionally, the plaintiffs assert that flood control can be accomplished by maintaining the project as a "dry dam" and that low flow augmentation is unnecessary.

The plaintiffs contend that the decision to impound was arbitrary and capricious inasmuch as the Corps' decision was not based on relevant factors and ignored relevant environmental consequences. Furthermore, the plaintiffs contend that the Corps has made the erroneous assumption that if the reservoir is to be impounded at all, that it must be impounded now. More specifically, the plaintiffs claim that the irrelevant factors considered by the Army included (a) wildlife subimpoundments, (b) low flow augmentation, (c) drinking water supply, and (d) fishing. Furthermore, the plaintiffs claim that certain relevant factors were ignored; to wit, (a) increased urbanization, (b) recreational resources on

the Nuese River, and (c) the benefits of deferring impoundment. Throughout the plaintiffs' objections, they point to the insufficiency of the evidence to support the Corps' decision to impound, and further, that the entire decisionmaking process filed to give good faith consideration to environmental factors. Additionally, the plaintiffs assert that the Corps failed to mitigate avoidable adverse environmental effects. It is within the confines of this broadside attack on the Corps' decision to impound that the Court will address the remainder of this opinion.

Since the parties have stipulated that the Corps has satisfied the procedural requirements set forth in NEPA, the Court's review of this matter will be limited to a determination of whether the Corps' decision and conclusions represented a "clear error in judgment." *Overton Park, supra.*

█ In reviewing the Corps' decision to proceed with the impoundment of the Jordan Dam, it is important to keep in mind that a reasoned decision can only be made upon the basis of information which is reasonably available. An agency processing an EIS and making the judgments required to be made by NEPA is not required to accumulate the sum total of scientific knowledge of the environmental elements affected by a proposal. *EDF, Inc. v. Corps of Engineers,* 348 F.Supp. 916, 927 (N.D.Miss. 1972), aff'd, 492 F.2d 1123 (5th Cir. 1974); *Movement Against Destruction v. Trainor,* 400 F.Supp. 533, 552 (D.Md.1975). Moreover, it is not necessary that all experts in the field need agree with the conclusions contained within the EIS or with the agency's decision nor does the law require that a court find the EIS is scientific perfection. *Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir. 1973); *Movement, supra.* Indeed, disagreement among the experts will not serve to invalidate the EIS or the decision to impound, for the purpose of NEPA is to bring all relevant factors and opinions to the front for full consideration by the agency. In this light, further studies, evaluation and analyses by experts are almost certain to reveal inadequacies or deficien-

cies. *Environmental Defense Fund v. Corps of Engineers,* 342 F.Supp. 1211, 1217 (E.D.Ark.1972), aff'd, 470 F.2d 289 (8th Cir. 1972). The purpose of the EIS is to inform the decisionmakers of the environmental ramifications of the proposed action. The statement need not achieve scientific unanimity on the desirability of proceeding with the proposed action. *Life of the Land, supra* at 473.

█ So it is in the present case, the plaintiffs' evidence conflicts with that of the defendant's experts in the conclusions which can be drawn from the material set forth in the EIS. Furthermore, the plaintiffs contend that by stalling the decision to impound it will enable additional studies to be made concerning water quality. The problem with this approach is that such will be the case in all projects authorized by Congress and an adoption of this position would result in an endless cycle of study and conflict among the experts. All that is required by NEPA is that the decisionmaker formulate an informed decision based upon available data. His conclusions must be reasonable and must not be set aside except upon a finding of a clear error in judgment. The Court concludes that there is no such clear error in the judgment in the present controversy. An examination of the plaintiffs' objections reveals the correctness of this resolution.

### Water Quality

(a) Drinking Water Supply: The plaintiffs contend that the consideration of the lake as providing a source of drinking water indicates how the Army utilized irrelevant factors in its conclusion to impound. They assert that the evidence clearly indicates that the quality of the water will be too poor for drinking purposes, and further, that there is a lack of need in the area for a water supply from the Jordan Project. The plaintiffs point to the highly trophic condition of the lake and concentrations of heavy metals in the proposed reservoir to support this conclusion. However, the weight of the expert testimony and lack of specific guidelines for testing the water quality in-

dicate that the majority of the lake will be suitable for raw water supply. The fact that the water may require certain treatment does not eliminate this factor from consideration because most of the water used for drinking in this area must be treated prior to consumption. As for the mercury content, there is substantial controversy on the appropriate guidelines to be applied. The Corps assumed that all the detectable mercury was of the toxic variety and still the experts agreed that this would pose no threat to human health. Additionally, it appears that the mercury content in this lake will be no different from that in many other North Carolina lakes presently being used for many purposes.

The plaintiffs claim that there is no present need for the water in the Jordan project as a drinking supply. This assertion clearly overlooks the critical need for more water in the Piedmont of North Carolina. The evidence would tend to show that the entire capacity of the proposed lake has already been requested by local communities for use as a raw water supply.

Basically, the plaintiffs contest the validity of the conclusions the defendant has made on the availability of the Jordan Lake as a raw water supply. However, the evidence, both empirical and expert, point to a differing conclusion. Clearly, the Corps' decision in this respect was not clearly erroneous. They took a hard look at all pertinent data and scientific opinion and arrived at a reasonable conclusion upon which some other reasonable men have differed. However, difference of opinion will not invalidate the Corps' decision. *Life of the Land, supra.* Accordingly, an examination of the exhibits and the testimony indicates that there was a sufficient rational basis for the District Engineer's conclusion that the water quality and need for a raw water supply justified the impoundment of the dam.

(b) Fish and Wildlife: The plaintiffs contend that another irrelevant fact which was considered by the Army in its decision to impound was the lake's use as a fish habitat and fishing area. This conclusion was drawn from the allegation that the lake would either (1) not support a substantial fish population, or (2) that the fish would not be suitable for human consumption. In support of this position the plaintiffs point specifically to the coliform counts and presence of mercury in the lake. The parties do not disagree on the data establishing the level of these factors in the fish population, rather, they differ on the effect of these matters on fish populations.

As with the plaintiffs' argument on the availability of the proposed lake as a raw water source, the weight of expert testimony is contrary to the plaintiffs' position. The testimony establishes that there is no substantial bacteriological threat to health from the coliform content in the lake. On the contrary, it would appear that the eutrophic condition of the lake will support a good fishery. The fact that there will probably be an abundant fish population, when considered with the fact that there is no present danger from the consumption of these fish, all serve to support the conclusion reached by the Army.

In addition to the fact that the lake will most probably support a useful fish habitat, the Army considered the measures to be taken should health hazards develop. These measures could include the posting of the lake during periods of possible danger. Also, the Court observes that any problem caused by mercury levels in the fish would be present whether impoundment were achieved or not. Furthermore, even the State of North Carolina does not object to the presently detected level of mercury in the sample fish and the experts support this in their conclusion that mercury does not present any health problem in the proposed lake.

By way of summary, the use of the reservoir for fishing purposes is not an irrelevant factor. The experts indicate that the lake will support a beneficial fish population. Accordingly, the Court concludes that the Corps' decision to consider the fishing aspects of the proposed impoundment was a reasonable choice based upon a consideration of the relevant facts.

(c) Water Recreation: The plaintiffs assert that the proposed impoundment will not result in the production of a lake capable of supporting water contact recreation. In support of this contention the plaintiffs point to the bacteria levels present in the proposed lake. The plaintiffs conclude that the bacterial limits exceed safe limits for contact sports. Accordingly, the plaintiffs state that swimming is not a factor the Army could consider in arriving at its decision to impound.

Again, as with other objections raised in opposition to the proposed impoundment, the plaintiffs' position is simply not supported by the greater weight of the evidence. The consensus conclusion of the qualified experts to testify at the trial indicates that much of the lake, if not all, would be safely available for swimming, boating, and other contact recreation. Moreover, one expert testified that there would be no bacteriological threat to health by the impoundment of the reservoir.

Although the plaintiffs have made a vigilant effort to point out their areas of disagreement with this conclusion, the expert testifying for the government, after reviewing the same data considered by the Army, has made a contrary conclusion.

Accordingly, the Court concludes that the quality of the water predicted to be contained in the proposed impoundment should support a wide variety of recreational and conservation uses.

### Flood Control and Low Flow Augmentation

Initially, the plaintiffs contend that flood control can be accomplished by maintaining the project as a "dry dam" as well as it can be satisfied by impoundment. Doubtlessly, this is a correct statement. However, the periodic flooding of the area, a necessary consequence of maintaining the project as a "dry dam" creates unsightly mudflats and accumulation of debris at outlet points in the dam. While, on the other hand, permanent impoundment can accomplish the benefits of flood control without the detriments present when the project is maintained as a "dry dam."

One significant advantage of maintaining a permanent lake over the continued operation of the project as a "dry dam" is the creation of a conservation pool capable of providing the downstream communities with low flow augmentation. Low flow augmentation benefits downstream communities through pollution dilution and by maintaining the river with a fairly constant flow of water. A constant river level assists downstream communities in their water supply and water treatment projects. In this respect, the Court heard evidence at the trial from downstream communities concerning the value derived from low flow augmentation.

The plaintiffs contend that the issue of low flow augmentation is an irrelevant factor to the decision to impound by reason of the Corps' failure to obtain a determination from the Administrator of the Environmental Protection Agency of the need for such augmentation. In support of this position, the plaintiffs call the Court's attention to the language present in the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1252(b), which seemingly requires such authorization prior to the consideration of low flow augmentation as a benefit to be derived from impoundment. The Court disagrees with this position for the reasons set forth by the Fourth Circuit Court of Appeals in its decision in *Cape Henry Bird Club v. Laird*, 484 F.2d 453 (4th Cir. 1973). The requirement for authorization by the Administrator of EPA for consideration of low flow augmentation pertains to only those projects in the "survey or planning stage." 33 U.S.C. § 1252(b)(1). This amendment was added in 1972, while construction on this project began some time prior to that date. Accordingly, since this project is neither in the survey or planning stage, nor is it before Congress for authorization or construction, the requirements of FWPCA are inapplicable to the present controversy. In any event, as previously discussed, the evidence is substantial that the downstream communities will benefit greatly by the availabili-

ty of low flow augmentation from the proposed impoundment.

The Court has not attempted to cover in detail each and every objection posed by the plaintiffs to the proposed impoundment. However, the Court has considered each objection and the evidence in support thereof, and concludes that each one fails for adequacy of proof.

The benefits derived from recreation, both in and on the water and land, water supply, fish and wildlife conservation and flood control with low flow augmentation seem to clearly tip the balance of environmental factors in favor of impoundment.

The evidence clearly establishes, and is fully set forth in the Corps' Notice of Decision to Impound, that all adverse consequences and benefits from the impoundment were taken into consideration prior to the issuance of the decision. The plaintiffs contend that additional tests and studies will indicate that their position is proper. However, the plaintiffs have failed to satisfy the Court that additional studies will result in any new or additional evidence bearing on the reasonableness of the Corps' decision. As previously mentioned, the environmental impact statute does not require every conceivable study be performed, rather, what is required is that the officials and agencies take a hard look at environmental consequences. *Sierra Club v. Froehlke, supra.* In compiling an EIS and making a decision to proceed with a project the agency must undertake in good faith a diligent research effort. This the Corps has done. Oftentimes, and such is the case here, certain assumptions must be made, and when made in good faith and with a rational explanation, the conclusions derived therefrom will not be set aside.

In all environmental cases something short of absolute certainty in a decision has to be accepted or else no project could ever be completed. In the present case, the Corps has considered the alternative of maintaining a "dry dam" versus that of impoundment and concluded that impoundment is more beneficial for the public. This was a decision that Congress has delegated

to the Corps and will not be set aside by this Court unless it was a clear error in judgment. Moreover, delay in impoundment was considered by the Army and rejected. Apparently, the Corps concluded, and the Court sustains, the belief that additional studies would be of little benefit in the ultimate conclusion of this case.

The plaintiffs' objection to the general esthetic appearance of the lake after impoundment is an objection based upon purely subjective considerations. Opposing this view, the Army has sought to compare the proposed lake to that of other lakes in the area. This comparison has been made on the basis of certain similarities between the Jordan area and that present in the region of other known lakes. From this comparison, which the Court concludes was not an unreasonable course to take, the Army has concluded that the Jordan Lake will be similar in appearance and quality to that of other lakes presently existing in North Carolina.

Certainly there are those who would prefer that this area remain in its natural state, however, the needs and demands of a growing society often require the making of hard decisions for the benefit of the greater number of citizens. The Corps has conducted a thorough interdisciplinary examination of the environmental and economic benefits and detriments of impoundment, and further, it has considered the alternatives available such as maintaining Jordan as a "dry dam" or delaying impoundment, and has reasonably concluded that the project should go forward. Moreover, the Corps has considered possible adverse consequences and achieved a sensible solution to them. Accordingly, the Court concludes that the decision to impound the B. Everett Jordan Dam Project was neither arbitrary nor capricious, and further, was not a clear error in judgment.

## VIII. CONCLUSION

Over thirty years ago Congress authorized an investigation into the feasibility of constructing dams for the control of flooding in this region. In 1963, Congress autho-

rized funds for the construction of this project so that the citizens in this area could enjoy the benefits of flood control, water quality control, general recreation, and fish and wildlife conservation to be derived from this project. Soon thereafter this litigation commenced sending this case back and forth from the Fourth Circuit on two occasions. Now, more than thirty-one years after Congress recognized the need for this project, and more than seven years after this litigation began, the Army Corps of Engineers has concluded that the relevant environmental factors and goals set by Congress mandate the completion of the final stage of this project; that is, the creation of the B. Everett Jordan Lake. The Court has made a conscientious effort to review all the objections raised by the plaintiffs with the relevant data and material which was available to the Army and concludes that it cannot in good faith block the final completion of this project. This Court's power of judicial review in this case is a narrow one. The Court's review should be applied with reason and with unwavering adherence to the important goals sought to be achieved by the mandates of this Nation's environmental policy. However, the Court cannot substitute its opinion for that of Congress. Accordingly, the Court has attempted to observe the rule of reason and practicality by taking a "hard look" at the relevant environmental and economic factors presented by the Corps' decision to proceed with the impoundment of the B. Everett Jordan Dam. It is the conclusion of this Court that the Corps of Engineers' decision to create the Jordan Lake was not arbitrary, capricious or an abuse of discretion, and further, that this decision was made in good faith after a consideration of all relevant factors, including possible alternative or mitigative measures.

Accordingly, the Court requests the defendant to prepare a proposed judgment dismissing this action to be submitted to the plaintiffs for delivery to the Court.

IT IS SO ORDERED.