In re Appeal from Environmental Management Comm.

IN THE MATTER OF: THE APPEAL FROM THE ENVIRONMENTAL MANAGEMENT COMMISSION FINAL ORDER GRANTING A CERTIFICATE OF AUTHORITY TO ORANGE WATER AND SEWER AUTHORITY PURSUANT TO G.S. 162A-7

No. 8010SC1069

(Filed 21 July 1981)

1. **Waters and Watercourses § 4— construction of reservoir—environmental impact statement required**

    The issuance of a certificate by the Environmental Management Commission authorizing acquisition of land for the construction of a reservoir constitutes a "recommendation or report on proposals for legislation and actions involving expenditure of public moneys for projects and programs significantly affecting the quality of the environment," G.S. 113A-4(2), thereby necessitating an environmental impact statement, since the proposed reservoir affected some 700 acres of land, most of which was woodland, there were potentially serious, adverse environmental effects which could not be avoided should the reservoir be constructed, and there were several viable alternatives to the reservoir project.

2. **Administrative Law § 8— judicial review of administrative decision—whole record test**

    The superior court judge did not apply the proper scope of review in determining the propriety of a decision by the Environmental Management Commission where the court's review described in its judgment did not comport with the "whole record" test required by the N.C. Administrative Procedure Act. G.S. 150A-51(5).

APPEAL by intervenors, Cane Creek Conservation Authority, Lower Cape Fear Water and Sewer Authority, Edward Johnson, Forrest Young, Cecil Crawford and Teer Farms, Inc., from the 5 March 1980 judgment of *Judge Herring* as amended by order entered 8 April 1980. Heard in the Court of Appeals 4 May 1981.

In 1976, acting pursuant to the provisions of G.S. 162A-3, the Board of Commissioners of Orange County, the Board of Aldermen of the Town of Chapel Hill, and the Board of Aldermen of the Town of Carrboro, by joint and several actions, organized and incorporated the Orange Water and Sewer Authority (hereinafter referred to as OWASA). Thereafter, in 1977, OWASA officially acquired title to, and possession of, the water and sewer utility systems and properties then owned by the State of North Carolina and operated by the University of North Carolina at Chapel Hill, by the Town of Chapel Hill, and by the Town of Carr-

boro. By law, the Authority was granted certain powers, among which were the powers to acquire, construct, improve, extend, maintain, and operate any water system or part thereof within or without the three participating political subdivisions, G.S. 162A-6(5).

On 21 December 1977, the Authority, acting pursuant to the provisions of G.S. 162A-7, petitioned the Environmental Management Commission (hereinafter the Commission) for a certificate authorizing institution of eminent domain proceedings in order to construct a dam and reservoir for water supply purposes. In its petition, OWASA alleged that, until the summer of 1968, the existing water supply source, University Lake, with its 675 million gallon impoundment on Morgan Creek, had been adequate to supply the needs of what is now OWASA's service area. In that year, however, a drought occurred, and the resulting shortage of water caused the University of North Carolina to sponsor several studies designed to solve the problem of an inadequate water supply. As a result of those studies, the continued growth of the population within the service area, and its inability to obtain an adequate and assured supplement of water from other municipalities, OWASA determined that there was a need to impound a permanent additional supply of water and that the best location for that impoundment would be on the waters of Cane Creek and its tributaries at a dam site located approximately one-half mile north of N.C. Highway 54 in southwestern Orange County. It, therefore, sought a certificate of approval and authorization from the Commission so that it might proceed with the acquisition of property by the power of eminent domain, if necessary.

On 6 January 1978, the Cane Creek Conservation Authority, an unincorporated association of landowners whose property was to be affected, filed a motion to intervene. On 7 February 1978, the Commission gave notice of an administrative hearing on OWASA's petition. Thereafter, in April 1978, the following parties moved to intervene in the petition: the Lower Cape Fear Water and Sewer Authority, the Town of Chapel Hill, the Town of Carrboro, the Board of Trustees of the University of North Carolina, and Edward Johnson, Forrest Young, Cecil Crawford, and Teer Farms, Inc. The motions to intervene were allowed by a hearing officer of the Commission.

On seven days in April, May, and June 1978, a three-member panel of the Commission heard the petition for the Cane Creek reservoir. At the hearing, OWASA presented evidence which tended to show that the existing water supply source, University Lake, was constructed during the early 1930's. That source was adequate until the drought of 1968 which necessitated emergency conservation measures as well as the purchase of treated water from the City of Durham. Since 1968, similar emergency measures have been necessary in three separate years. The adequacy of the water supply has also been affected by an increase in population; between 1968 and 1977, the population requiring service increased fifty percent.

Among the sources considered for the additional supply of water were (1) Morgan Creek (additional development), (2) Cane Creek, (3) the City of Durham, and (4) Lake Jordan. A 1969 study sponsored by the University of North Carolina and conducted by the New York engineering consulting firm of Hazan and Sawyer included a comparative analysis of these four alternative sources and resulted in a recommendation that the University of North Carolina, which owned the water system at that time, authorize, without delay, the Cane Creek project.

Five witnesses called by OWASA and associated either with the University of North Carolina or the State of North Carolina testified that Cane Creek would be the best source of water for OWASA. The principal advantage of the Cane Creek project appeared to be that the watershed, relative to other watersheds in the Piedmont area of North Carolina, would provide a higher-quality water. In the Cane Creek watershed, there are no "point" sources of pollution. On the other hand, the Lake Jordan dam will receive water from the Haw and New Hope Rivers both of which are downstream of growing and well-developed urban and industrial areas, sources of pollution which render the quality of water at that lake questionable.

The feasibility of purchasing a permanent water supply from the City of Durham received a low evaluation by OWASA witnesses because of OWASA's dependence on the City of Durham and the unpredictablity of cost. As to the fourth alternative, additional development of Morgan Creek, OWASA's position, as stated by its witnesses, appeared to be that this source

would be protected for future municipal water supply purposes. Use of the Cane Creek reservoir at this point, therefore, would preserve both alternatives.

OWASA, therefore, proposed an earthen dam on Cane Creek 2,600 feet north of the N.C. Highway 54 bridge across the creek. The proposed Cane Creek reservoir would impound the runoff of 32 square miles and have the capacity of three billion gallons. A safe yield would be ten million gallons per day. In order to construct the reservoir, OWASA must acquire approximately 700 acres of land. The cost, projected in 1977, was $7,800,000.

The appellants, opponents of the Cane Creek alternative, put on evidence which tended to focus on the viability of other alternatives. One expert, a water quality chemist from the U.S. Army Corps of Engineers, testified that three segments of the Jordan reservoir would be suitable for public water supply purposes and that, of these three segments, one was the area of the reservoir between U.S. 64 and Farrington Road, the point at which an intake and pumping station for OWASA's needs might be located. There was additional evidence by the appellants that raised the question of whether the proposed Cane Creek reservoir would be subject to runoffs of water containing argicultural herbicides and pesticides which would contaminate the supply.

As to the impact of the proposed reservoir on the Cane Creek area, predominantly prime agricultural land, an expert in the field of dairy farming testified that the proposed project would be very detrimental to the dairy farms located there because of resulting pressures for residential development and increased environmental pressures against the use of herbicides and pesticides, necessities in dairy farm operations. Furthermore, Michael Godfrey, an expert in the field of botany and natural history testified that there is a rare plant life along the stretch of Cane Creek that would be inundated. Mr. Godfrey characterized Cane Creek as biologically "the most . . . important place in Orange County."

After hearing this and other evidence, the three-member panel issued a majority report recommending denial of the certificate sought by OWASA. The majority report proposed finding, among other things, deficiencies in OWASA's analysis of environmental impacts and economic factors, the use of unwar-

ranted assumptions related to water treatment, inadequate assessment of the social impact of the proposed reservoir, and an inadequate survey of botanical life threatened by the project. Nevertheless, the full Commission adopted the recommendation of the minority report and granted OWASA a certificate authorizing acquisition of the necessary water, water rights, and land for the Cane Creek reservoir. The appellants herein sought judicial review, pursuant to the provisions of G.S. 150A-43 *et seq.*, in superior court, Wake County. The judgment of the court, filed 5 March 1980, and amended 8 April 1980, upheld the order of the Commission. An appeal was brought to this Court.

*Claude V. Jones for petitioner-appellee, Orange Water and Sewer Authority.*

*Emery B. Denny, Jr., for intervenor-appellee, Town of Chapel Hill.*

*Michael B. Brough, for intervenor-appellee, Town of Carrboro.*

*Attorney General Edmisten, by Special Deputy Attorney General W. A. Raney, Jr., for intervenor-appellee, the Board of Trustees of the University of North Carolina at Chapel Hill, and for appellee, the Environmental Management Commission.*

*Pinna and Corvette, by T. E. Corvette, Jr., and Singleton, Murray, Harlow and Little, by David A. Harlow, for intervenors-appellants, Cane Creek Conservation Authority, Lower Cape Fear Water and Sewer Authority, Edward Johnson, Forrest Young, Cecil Crawford, and Teer Farms, Inc.*

MORRIS, Chief Judge.

[1] The first assignment of error that we shall consider is whether the superior court judge erred in affirming the decision of the Commission, which was made without the filing or consideration of an environmental impact statement. The requirement that State agencies prepare environmental impact statements of proposed projects is contained in the provisions of North Carolina's Environmental Policy Act, G.S. 113A-1 *et seq.* An analysis of the question posed in the case *sub judice* must, therefore, begin with an examination of that Act.

Despite the fact that the Environmental Policy Act became effective almost ten years ago, our courts have rendered few deci-

sions clarifying what we read to be a mandate for State agencies to take an active role "to conserve and protect . . . [the State's] natural resources and to create and maintain conditions under which man and nature can exist in productive harmony." G.S. 113A-3. The purposes of the Act are, *inter alia,* to declare a State policy which encourages "the wise, productive, and beneficial use of the [State's] natural resources . . . without damage to the environment," which maintains a healthy environment, and which preserves the natural beauty of the State. G.S. 113A-2. A further purpose is to require agencies of the State to consider and report upon environmental aspects and consequences of their actions which involve the expenditure of public moneys. *Id.*

The requirement of an environmental impact statement, as described in the provisions of G.S. 113A-4(2), clarifies the sort of consideration of environmental values and inter-agency cooperation compelled by the Act:

§ 113A-4. *Cooperation of agencies; reports; availability of information.* — The General Assembly authorizes and directs that, to the fullest extent possible:

\* \* \*

(2) Any State agency shall include in every recommendation or report on proposals for legislation and actions involving expenditure of public moneys for projects and programs significantly affecting the quality of the environment of this State, a detailed statement by the responsible official setting forth the following:

a. The environmental impact of the proposed action;

b. Any significant adverse environmental effects which cannot be avoided should the proposal be implemented;

c. Mitigation measures proposed to minimize the impact;

d. Alternatives to the proposed action;

e. The relationship between the short-term uses of the environment involved in the proposed action and the maintenance and enhancement of long-term productivity; and

f. Any irreversible and irretrievable environmental changes which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible official shall consult with and obtain the comments of any agency which has either jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such detailed statement and such comments shall be made available to the Governor, to such agency or agencies as he may designate, and to the appropriate multi-county regional agency as certified by the Director of the Department of Administration, shall be placed in the public file of the agency and shall accompany the proposal through the existing agency review processes. A copy of such detailed statement shall be made available to the public and to counties, municipalities, institutions and individuals, upon request.

The requirement of the impact statement is designed, therefore, to provide a mechanism by which all affected State agencies raise and consider environmental factors of proposed projects.

With this background of the Environmental Policy Act before us, the first question we must consider is whether the issuance of a certificate authorizing acquisition of land for the construction of a reservoir constitutes, on the part of the Commission, a "recommendation or report on proposals for legislation and actions involving expenditure of public moneys for projects and programs significantly affecting the quality of the environment . . .," G.S. 113A-4(2), thereby necessitating an environmental impact statement.

The question of whether certification action by the Commission constitutes State action triggering the preparation of an impact statement is one of first impression in this jurisdiction. Under federal law, however, the issue is well decided. Under the National Environmental Policy Act, 42 U.S.C. 4321 *et seq.*, and specifically 42 U.S.C. 4332(2)(C), all federal agencies must include an impact statement on "major Federal actions significantly affecting the quality of the human environment. . . ." "Federal action" has been interpreted to mean "not only action undertaken by the agency itself, but also any action permitted or approved by the agency." *Sierra Club v. Morton,* 514 F. 2d 856, 875 (D.C. Cir. 1975), *cert. dismissed* 424 U.S. 901, 96 S.Ct. 1091, 47 L.Ed. 2d 105, *reversed on other grounds* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed. 2d 576 (1976). In *Sierra Club v. Morton,* the District of Columbia

Court of Appeals held that, since development of coal resources in the Northern Great Plains Province was subject to federal approval, federal action necessitating an impact statement was involved. Similarly, in *Davis v. Morton*, 469 F. 2d 593 (10th Cir. 1972), the Tenth Circuit Court of Appeals held that the Secretary of the Interior's authority to ratify or reject leases relating to Indian lands constituted major federal action necessitating a study and evaluation of the environmental impact of the project. *See also Greene County Planning Board v. Federal Power Com'n*, 455 F. 2d 412 (2d Cir. 1971), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed. 2d 90 (1972).

A determination of whether certification by the Environmental Management Commission is considered State action triggering the necessity of an impact statement is aided by a review of the Commission's function in exercising this authority. Under the provisions of G.S. 162A-7(c), the Environmental Management Commission is directed to "issue certificates only to projects which it finds to be consistent with the maximum beneficial use of the water resources in the State. . . ." In doing so, the Commission must consider:

(1) The necessity of the proposed project;

(2) Whether the proposed project will promote and increase the storage and conservation of water;

(3) The extent of the probable detriment to be caused by the proposed project to the present beneficial use of water in the affected watershed and resulting damages to present beneficial users;

(4) The extent of the probable detriment to be caused by the proposed project to the potential beneficial use of water on the affected watershed;

(5) The feasibility of alternative sources of supply to the petitioning authority and the comparative cost thereof;

(6) The extent of the probable detriment to be caused by the use of alternative sources of supply to present and potential beneficial use of water on the watershed or watersheds affected by such alternative sources of supply;

(7) All other factors as will, in the Board's opinion, produce the maximum beneficial use of water for all in all areas of the State affected by the proposed project or alternatives thereto.

G.S. 162A-7(c). From a reading of this mandate, it appears obvious that the Legislature, in granting the Commission the authority to issue certificates authorizing land and water rights acquisition, intended that the Commission consider carefully not only the development of water resources but also the effect of that development on present beneficial users within the watershed. When G.S. 162A-7(c) is read in conjunction with North Carolina's Environmental Policy Act, it becomes apparent that certification action by the Commission is State action which, if it significantly affects the environment, necessitates an impact statement.

The proposed Cane Creek reservoir affects some 700 acres of land most of which is woodland. There was ample evidence at the hearing that there are potentially serious, adverse environmental effects which cannot be avoided should the reservoir be constructed. There was also ample evidence that there were several viable alternatives to the Cane Creek project. We believe that, in this situation, the statutory requirement that the State action significantly affect the environment has been met.

This Court, therefore, having reviewed the federal cases requiring environmental impact statements in the granting or denial of licenses and permits, having compared the federal and state environmental policy acts, and having studied the function of the Commission in the certification process, concludes that the North Carolina Environmental Management Commission should have had before it a final environmental impact statement before rendering its decision to grant a certificate for OWASA to proceed with the Cane Creek reservoir.

In so holding, this Court is not dictating what the final decision of the Environmental Management Commission should be or even what effect an impact statement should have on that decision. It is not for this Court to substitute its judgment for that of the Commission as to the environmental consequences of the proposed reservoir. *See, e.g., Orange County v. Dept. of Transportation*, 46 N.C. App. 350, 265 S.E. 2d 890 *disc. review denied*, 301 N.C. 94, --- S.E. 2d --- (1980). It is proper, however, for this

Court to review the manner in which an agency decision has been made to insure that environmental consequences have been considered in the manner prescribed by law. *Id.*

In finding that an environmental impact statement is necessary, we have rejected appellees' argument that, in the present case, "environmental issues were thoroughly discussed and anyone who wished to present their [*sic*] views on environmental impacts could participate in the administrative hearing." This reasoning defies the clear mandate of the act that State agencies assume the responsibility of studying and considering environmental consequences of proposed actions. This duty may not be avoided on the theory that interested parties will perform it. Nor is the provision of a forum for discussion of environmental issues sufficient.

At this point we note that an environmental impact assessment of the proposed Cane Creek reservoir was prepared for OWASA. At the hearing, however, substantial deficiencies in both the environmental analysis as well as the economic analysis of the proposed project were identified by parties to the proceeding, including the U.S. Army Corps of Engineers. That assessment, therefore, was not adequate to perform the function required of an environmental impact statement.

In making our decision, this Court has also rejected appellees' argument that the U.S. Army Corps of Engineers' future compliance with the National Environmental Policy Act* fulfills the obligations of the Commission to file an environmental impact statement with its certification. We believe that, as in the federal system, the purpose of an environmental impact statement is to provide the responsible State agency with a useful decision-making tool. *See, e.g., Minnesota Public Interest Research Group v. Butz,* 541 F. 2d 1292 (8th Cir. 1976), *cert. denied,* 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed. 2d 601 (1977). In order for the statement to be a decision-making tool, the responsible State agency must have the statement before it when it is determining the action it is going to take or recommend. In the present case, the fact that the U.S. Army Corps of Engineers was in the process of preparing

---

*Under 33 U.S.C. 1344, the Corps of Engineers must issue to OWASA a dredge and fill permit which, under the national act, necessitates the Corps' filing of an environmental impact statement.

an environmental impact statement is not sufficient to comply with the requirement that the Commission itself consider the statement and that the Commission circulate the environmental impact statement among other State agencies which, because of special expertise or jurisdiction, have an interest in the environmental impacts involved.

Because the Commission did not have a final environmental impact statement as required by G.S. 113A-4(2) when it made its decision to issue a certification for the Cane Creek reservoir, the superior court judgment finding that the decision of the Commission was not affected by any error of law (*see*, G.S. 150A-51) must be vacated. The matter must be remanded to the Environmental Management Commission for a review of OWASA's petition in light of an environmental impact statement.

[2]  Because of the likelihood that this highly contested case will, after reconsideration by the Commission, proceed through the judicial review process again, we deem it necessary to address the question, raised by the appellants, of whether the superior court judge applied the proper scope of review in determining the propriety of the Commission's action. His judgment as amended contained the following introductory paragraph:

"This matter was heard before the undersigned Judge on Petition for Review of a decision of the Environmental Management Commission (Commission or EMC) and a Petition to Reopen the matter by remanding it to the EMC for the consideration of additional evidence. *While the Court has not read the entire Record which was before the EMC,* it has considered the pertinent portions of the Record as referred to in the petition and briefs of the parties, it having been stated by counsel for petitioners on the hearing in open court that some portions of the Record were not material to the exceptions taken and questions raised and no useful purpose would be served by considering those portions and the Court has also considered the briefs filed by the parties and the oral arguments made by counsel for the parties. Based on the entire record as herein stated, as well as the briefs and arguments of counsel, the Court finds and concludes that. . . ." [Emphasis added.]

This Court finds that the review described in the amended judgment did not comport with the "whole record" test required by the North Carolina Administrative Procedure Act, G.S. 150A-1, *et seq.*, specifically, G.S. 150A-51(5). In *Thompson v. Board of Education*, 292 N.C. 406, 233 S.E. 2d 538 (1977), the Supreme Court described the requirements of the test:

> [T]he "whole record" rule requires the court, in determining the substantiality of evidence supporting the . . . [agency's] decision, to take into account whatever in the record fairly detracts from the weight of the . . . [agency's] evidence. Under the whole evidence rule, the court may not consider the evidence which in and of itself justifies the Board's result, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.

*Id.* at 410, 233 S.E. 2d at 541. Under the whole record test, the judge reviewing an administrative decision must consider the *complete* testimony of *all* the witnesses. *Thompson v. Board of Education, supra.*

In the present case, it is impossible to determine from the judgment entered by the superior court exactly what the judge reviewed. It is clear, however, that his review did not encompass the entire record and, therefore, fell short of the statutorily mandated scope of review. We deem strict adherence to the whole record test especially important in the instant case where the proceedings are held before a commission which is part of the executive branch of State government and the parties to the proceeding include at least one other arm of State government (the University of North Carolina). No party to this appeal has raised the issue of constitutional due process, nor do we address that issue here. We do hold, however, that, under the facts of this case, a complete review of the agency decision by the judicial branch of government, *i.e.* by the Wake County Superior Court, is absolutely essential.

In this appeal, appellants also raise the question of whether the decision of the Commission, which was, to some degree, predicated upon its determination that the Haw River and Lake Jordan did not present viable alternatives to the Cane Creek reservoir, was precluded by the doctrine of collateral estoppel. Appellants argue that the case of *Conservation Council of North*

Ziglar v. Du Pont Co.

*Carolina v. Froehlke*, 435 F. Supp. 775 (M.D.N.C. 1977), which contained numerous findings of fact supportive of the use of these bodies of water as a public water source, was *res judicata* on the issue of water quality and, therefore, barred the Commission from its determination of that issue. We reject this contention. Since the plea of *res judicata* ordinarily may be maintained only where "there is an identity of parties, subject matter, and issues," *Kleibor v. Rogers*, 265 N.C. 304, 144 S.E. 2d 27 (1965), the doctrine is clearly not applicable to this case. Neither the parties nor the issues being considered is identical in the two cases.

Finally, we note that, in their brief, appellants have raised numerous evidentiary questions. Since these questions are unlikely to recur on the remand of this case, we deem it unnecessary to address them.

The decision of the Wake County Superior Court is vacated, and this case is remanded to the Environmental Management Commission for action consistent with this opinion.

Vacated and remanded.

Judges WEBB and WHICHARD concur.